# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **QUALITY CONTROL SYSTEMS CORP.,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> **U.S. DEPARTMENT OF TRANSPORTATION,** ) <br> ) <br> **Defendant.** ) <br> ) | Civil Action No. 17-cv-01266 (BAH) |

## DEFENDANT U.S. DEPARTMENT OF TRANSPORTATION'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, the U.S. Department of Transportation, by and through its undersigned counsel, respectfully moves this Court for summary judgment. A Statement of Material Facts to Which There is No Genuine Dispute, Memorandum of Points and Authorities, and Proposed Order are attached.

Respectfully submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

By: _____/s/_____
CLAIRE WHITAKER, Bar # 354530
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2526 (office)
Claire.Whitaker@usdoj.gov

OF COUNSEL:

Elizabeth H. Mykytiuk
Senior Trial Attorney, Litigation and Enforcement
Department of Transportation
National Highway Traffic Safety Administration

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| QUALITY CONTROL SYSTEMS CORP., <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF TRANSPORTATION, <br><br> Defendant. | Civil Action No. 17-cv-01266 (BAH) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS TO
WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Civil Rule 7(h)(i), Defendant U.S. Department of Transportation ("DOT"), by and through its undersigned counsel, respectfully submits this Statement of Material Facts to Which There is No Genuine Dispute in support of its Motion for Summary Judgment.

In support of its Motion for Summary Judgment and this Statement of Material Facts, DOT attaches the following declarations: (1) Declaration of Jeffrey Quandt, Chief of Vehicle Defect Division D, Office of Defects Investigation at the National Highway Traffic Safety Administration ("NHTSA") (attached hereto as Exhibit A); and (2) Otto G. Matheke, III, Senior Attorney within the Litigation and Enforcement Division of the NHTSA Office of Chief Counsel (attached hereto as Exhibit B).

1.  NHTSA is the operating administration within DOT responsible for improving vehicle safety on U.S. highways, including "investigating safety-related defects . . . in motor vehicles and motor vehicle equipment and administering related recalls." 49 C.F.R. § 1.94(b). NHTSA administers the National Traffic and Motor Vehicle Safety Act, as amended, 49 U.S.C. Chapter 301. *See* 49 CFR 1.95.

2. On May 7, 2016, a 2015 Tesla Model S collided with a tractor trailer crossing an uncontrolled intersection on a highway in Williston, Florida, resulting in fatal injuries to the driver. Exhibit A at ¶ 5. At the time of the crash, the Model S was operating in Autopilot mode. *Id*.

3. Tesla's Autopilot system is an advanced driver assistance system, which controls vehicle speed and path by automated control of braking, steering, and torque to the drive motors. *See id.* at ¶ 6. While the major subsystems associated with Autopilot are Traffic-Aware Cruise Control and Autosteer, Autopilot also works in concert with Tesla's Automatic Emergency Braking (AEB) system, which is designed to provide alerts and automatic braking assistance in certain circumstances. *Id*.

4. On June 28, 2016, NHTSA's Office of Defects Investigation ("ODI"), the office responsible for investigating safety defects, 49 C.F.R. § 554.5, opened an investigation into the design and performance of the AEB and Autopilot systems enabled and in use at the time of the Williston crash. *Id*. at ¶ 7. The investigation was designated by NHTSA as Preliminary Evaluation, PE16-007. *Id.*

5. In connection with the investigation, ODI Division Chief Jeffrey L. Quandt sent Tesla an information request letter dated July 8, 2016. *See id.* at ¶ 9.

6. Among the requests was Question 1, which sought information on vehicles Tesla manufactured for sale or lease in the United States and federalized territories, including, among other things, the dates and mileages when Autosteer and AEB software were installed, the number of AEB events before and after Autosteer was installed, and whether there were any airbag deployments before or after Autosteer was installed. *See* Exhibit 2 at p. 2. Tesla was instructed to submit the information to NHTSA in a Microsoft Access database. *See id*.

7.  Tesla responded to Question 1 on August 8, 2016, providing both a brief, narrative response and the requested Access database. Exhibit 2 at p. 2; Exhibit 3.

8.  The response and Access database were accompanied by a request for confidential treatment under 49 C.F.R. Part 512. *See* Exhibit 4.

9.  ODI closed PE16-007 on January 19, 2017, after concluding that the Autopilot and AEB systems performed as designed and finding insufficient evidence of a defect trend to support the continued examination of the issue. *See* Exhibit 1. The closing report, which was attached to the closing resume, included a graph, labeled as Figure 11, showing the rates for airbag deployment crashes in Tesla vehicles before and after Autosteer installation. *Id.*, Closing Report at p. 11. The rates were calculated by Mr. Quandt based upon information contained in the Access database. Exhibit A at ¶¶ 15-16.

10. On February 24, 2017, approximately one month after NHTSA published the closing report, Plaintiff Quality Control Systems Corp. ("QCS") sent NHTSA a FOIA request for records related to Figure 11. Exhibit 6. Therein, QCS sought "all of the mileage and airbag deployment data supplied by Tesla [and] analyzed by ODI to calculate the crash rates shown in Figure 11." *Id.* at p. 2. QCS also sought "records related to any statistical summaries, formulas, models, adjustment, sample weights, and/or any other data or methods relied upon to calculate the crash rates shown in Figure 11." *Id.*

11. NHTSA's FOIA Office acknowledged receipt of QCS's request on March 3, 2017. *See* Exhibit 7.

12. Approximately four weeks later, NHTSA notified QCS that it would need additional time to respond to the FOIA request, stating that it expected to provide a response by April 14, 2017. Exhibit 8.

13. On or about April 11, 2017, Mr. Quandt conducted a search for records responsive to QCS's request. *See* Exhibit A at ¶¶ 21-22. He reviewed both his computer and email files, after which he identified the following responsive records: an Access database titled "CBI_PE16-007_PRODUCTION DATA," and an Excel file he used to perform the calculation for Figure 11 (which included a complete copy of the Access database) titled "PE16_007_PRODUCTION DATA_jlq_working_file_10Jan2017." *Id.* at ¶ 23. In identifying these documents to NHTSA's FOIA Office, Mr. Quandt noted that they contained information that had been marked by Tesla as confidential business information. *Id.* at ¶ 24.

14. At the time of QCS's FOIA request, NHTSA's Office of Chief Counsel had not yet issued a decision on Tesla's August 8, 2016 request for confidential treatment. *See* Exhibit B at ¶ 12. NHTSA's Office of Chief Counsel was asked to make a determination on that request. *Id.* Prior to doing so, NHTSA was required to maintain the confidentiality of the information until it issued such a decision. *Id.* at ¶ 7.

15. In or about early May 2017, a staff attorney in NHTSA's Chief Counsel's Office reviewed Tesla's August 8, 2016 submission and request for confidential treatment, ultimately concluding that the submission (including the Access database) was entitled to confidential treatment under Exemption 4. *Id.* at ¶ 13.

16. That determination was then reviewed by Otto G. Matheke III, a Senior Attorney within the Litigation and Enforcement Division of NHTSA's Chief Counsel's Office, as well as the Acting Assistant Chief Counsel for Litigation and Enforcement. *See id.* at ¶¶ 14-15. NHTSA ultimately issued a decision letter to Tesla on July 5, 2017. Exhibit 5.

17.     NHTSA's FOIA Office then responded to QCS's request for records on July 21, 2017, notifying the company that NHTSA had located responsive records, but that it was withholding them under Exemption 4. *See* Exhibit 9.

          Respectfully submitted,

          JESSIE K. LIU, D.C. Bar #472845
          United States Attorney
          for the District of Columbia

          DANIEL F. VAN HORN, D.C. Bar # 924092
          Chief, Civil Division

By: _____/s/_____
CLAIRE WHITAKER, Bar # 354530
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2526 (office)
Claire.Whitaker@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| QUALITY CONTROL SYSTEMS CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 17-cv-01266 (BAH) |
| ) | |
| U.S. DEPARTMENT OF TRANSPORTATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF U.S. DEPARTMENT OF TRANSPORTATION'S MOTION FOR SUMMARY JUDGMENT**

Defendant U.S. Department of Transportation ("DOT"), by and through its undersigned counsel, respectfully submits this Memorandum of Points and Authorities in support of its Motion for Summary Judgment.

**I.    INTRODUCTION.**

This lawsuit involves Plaintiff Quality Control System Corporation's ("QCS") request for a discrete set of data from the National Highway Traffic Safety Administration ("NHTSA") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. QCS's Complaint is based solely on its claim that it did not receive a response to that FOIA request. NHTSA, however, has since responded, having conducted an adequate search for responsive records and appropriately applying 5 U.S.C. § 552(b)(4) ("Exemption 4") to withhold confidential commercial information. Because the requested records are exempt from disclosure and QCS suffered no harm by the brief, three-month delay in NHTSA's response, DOT is entitled to summary judgment.

## II. BACKGROUND FACTS.

### A. Tesla Model S Crash.

On May 7, 2016, a model year 2015 Tesla Model S was involved in a fatal crash in Williston, Florida. Statement of Material Facts ("SMF") ¶ 2. The crash occurred when the Model S collided with a tractor trailer that was crossing the highway at an uncontrolled intersection – *i.e.*, an intersection with no traffic signals or signs. *Id.* The crash received nationwide attention because, at the time of the crash, the Model S was operating in Autopilot mode. SMF ¶ 2; https://www.washingtonpost.com/news/the-switch/wp/2016/06/30/tesla-owner-killed-in-fatal-crash-while-car-was-on-autopilot/?utm_term=.0c9828cd471c (last visited Oct. 10, 2017).

Tesla's Autopilot system is an advanced driver assistance system, which controls vehicle speed and path by automated control of braking, steering, and torque to the drive motors. SMF ¶ 3. While the major subsystems associated with Autopilot are Traffic-Aware Cruise Control and Autosteer, Autopilot also works in concert with Tesla's Automatic Emergency Braking (AEB) system, which is designed to provide alerts and automatic braking assistance in certain circumstances.[1] *Id.* The Williston incident raised questions as to why neither these advanced technologies nor the driver reacted to the tractor trailer to prevent or mitigate the crash.

### B. Preliminary Evaluation, PE16-007.

NHTSA is the operating administration within DOT responsible for improving vehicle safety on U.S. highways. SMF ¶ 1. NHTSA administers the National Traffic and Motor Vehicle

---

[1] "Automatic Emergency Braking includes the following crash avoidance technologies: Forward Collision Warning ("FCW"), Dynamic Brake Support ("DBS"), and Crash Imminent Braking ("CIB"). An FCW is presented to the driver if the system predicts a crash with an object in the vehicle's forward path is imminent. To be effective, such alerts are provided with sufficient lead-time for the driver to assess the potential hazard, and to respond with the appropriate braking or steering needed to avoid the crash. If the driver chooses to avoid the crash by braking, but does not apply sufficient braking to do so, DBS automatically supplements their application. If the driver does not take action to avoid the crash, CIB automatically applies the vehicle's brakes so that it may be mitigated or avoided." Exhibit 1, Closing Report at p. 1.

Safety Act, as amended, 49 U.S.C. Chapter 301. *See id*. Among other things, the Motor Vehicle Safety Act provides NHTSA with the authority to order manufacturers to recall and repair motor vehicles or motor vehicle equipment when its investigations indicate that vehicle or equipment contains a safety defect in its design, construction, or performance. 49 U.S.C. § 30118; 49 C.F.R. § 1.94(b). Such investigations are conducted through NHTSA's Office of Defect Investigations (ODI). 49 C.F.R. § 554.5.

On June 28, 2016, ODI opened an investigation (Preliminary Evaluation, PE16-007) to examine the performance of the Model S's AEB system and any other forward crash mitigation or forward crash avoidance systems enabled and in use at the time of the Williston crash. SMF ¶ 4. In connection with the investigation, ODI Division Chief Jeffrey L. Quandt sent Tesla an information request letter on July 8, 2016. SMF ¶ 5. At issue here is Question 1, which requested certain information on all Tesla vehicles equipped with Autopilot, such as the dates and mileages when Autosteer and AEB were installed, the number of AEB events recorded before and after Autosteer was installed, and whether the vehicles experienced any airbag deployments before or after Autosteer was installed. SMF ¶ 6. ODI requested that this data be submitted in the following electronic format: "Microsoft Access 2003, 2007, or a compatible format, entitled "PE16 007 PRODUCTION DATA." *Id*. Tesla responded to Question 1 on August 8, 2016, providing both a brief, narrative response and the requested Access database. SMF ¶ 7. The response and Access database were accompanied by a request for confidential treatment under 49 C.F.R. Part 512. SMF ¶ 8; Exhibit 4.

ODI closed its investigation on January 19, 2017, and issued a 12-page closing report, concluding that the Autopilot and AEB systems performed as designed and finding insufficient

3

evidence of a defect trend to support the continued examination of the issue. SMF ¶ 9; Exhibit 1.

NHTSA's closing report included the following chart:



Figure 11. Crash Rates in MY 2014-16 Tesla Model S and 2016 Model X vehicles Before and After Autosteer Installation.

*See* Exhibit 1, Closing Report at p. 11. Figure 11 shows the rates, which were calculated by Mr. Quandt, for airbag deployment crashes in Tesla vehicles before and after Autosteer installation. SMF ¶ 9.

    C.    **QCS's FOIA Request.**

On February 24, 2017, approximately one month after NHTSA issued the closing report, QCS sent NHTSA a FOIA request for records related to Figure 11. SMF ¶ 10; Exhibit 6. Specifically, QCS sought "all of the mileage and airbag deployment data supplied by Tesla analyzed by ODI to calculate the crash rates shown in Figure 11." SMF ¶ 10; Complaint at ¶ 5 (Docket No. 1). QCS also sought "records related to any statistical summaries, formulas, models,

4

adjustment, sample weights, and/or any other data or methods relied upon to calculate the crash rates shown in Figure 11." *Id*.

NHTSA's FOIA Office acknowledged receipt of QCS's request on March 3, 2017. SMF ¶ 11. Approximately four weeks later, NHTSA notified QCS that it would need additional time to respond to the request, stating that it expected to provide a response by April 14, 2017. SMF ¶ 12.

On June 28, 2017, QCS filed the instant case against DOT, alleging that it had not yet received a response to its FOIA request. *See* Complaint at ¶ 8.[2] QCS further claimed that DOT had wrongfully withheld the requested records by failing to comply with the statutory time limit for rending a determination or response. *See* Complaint at ¶ 11. DOT answered the Complaint on August 22, 2017, denying these allegations. *See* Docket No. 7.

D.      **NHTSA's Search for Records and FOIA Response.**

As the lead investigator for PE16-007, Mr. Quandt transmitted the request for information to Tesla, received the response from Tesla, and prepared the closing report (including Figure 11). SMF ¶¶ 5,7, 9.  In that capacity, he also maintained the records responsive to QCS's FOIA request. *See* Exhibit at ¶¶ 11, 19. On or about April 11, 2017, Mr. Quandt conducted a search for records responsive to QCS's request. SMF ¶ 13. He diligently reviewed both his computer and email files, after which he identified the following responsive records: an Access database titled "CBI_PE16-007_PRODUCTION DATA," and an Excel file he used to perform the calculation for Figure 11 (which included a complete copy of the Access database)

---

[2] QCS alleges that it "exhausted the applicable and available administrative remedies with respect to defendant's processing of plaintiff's FOIA request." Complaint at ¶ 10. While DOT's FOIA regulations do not require an exhaustion of administrative remedies before judicial review, DOT does provide an administrative appeals process for FOIA requests. *See* 49 C.F.R. § 7.32; *see also* SMF ¶ 17; Exhibit 9. DOT is not aware of any administrative appeal filed by the QCS either on the basis of an untimely response or the denial of the records request. *See* 49 C.F.R. § 7.32(d).

titled "PE16_007_PRODUCTION DATA_jlq_working_file_10Jan2017." *Id*. In forwarding these documents to NHTSA's FOIA Office, Mr. Quandt noted that the Access database file name included a confidential designation (*i.e.*, CBI) indicating that the entire file was subject to a request for confidential treatment, and that the Excel file contained information for which Tesla had requested confidential treatment. *Id.*

NHTSA's regulations prescribe how it handles confidential information submitted to the agency. *See* 49 C.F.R. Part 512. The regulations address the submission required to support a request for confidential treatment, the treatment to be afforded by NHTSA while the request is pending, the standard for making a confidentiality determination, and the circumstances in which confidential information may be publicly released. *Id.* Because Tesla had requested confidential treatment for the information contained in the Access database, NHTSA's regulations required it to keep the information confidential until the Chief Counsel's Office made a determination regarding its confidentiality. *See* 49 C.F.R. § 512.20; SMF ¶ 14. At the time of QCS's February 24, 2017 FOIA request, no determination had yet been made on Tesla's August 8, 2016 request for confidential treatment. SMF ¶ 14.

After being notified that records responsive to QCS's FOIA request were covered by Tesla's August 8, 2016 confidentiality request, NHTSA's Chief Counsel's Office was asked to make a determination on the request. *Id*. In early May 2017, a staff attorney in Chief Counsel's Office completed her analysis of Tesla's August 8, 2016 submission and request for confidential treatment, ultimately concluding that the submission (including the entire Access database) was entitled to confidential treatment under Exemption 4. SMF ¶ 15. That determination was then reviewed by another senior attorney and the Acting Assistant Chief Counsel for Litigation and

Enforcement before NHTSA ultimately issued its decision letter to Tesla on July 5, 2017. SMF ¶ 16

NHTSA's FOIA Office responded to QCS's request on July 21, 2017, notifying the company that NHTSA had located responsive records, but that it was withholding them under Exemption 4. SMF ¶ 17; Exhibit 9.

## III. ARGUMENT

### A. Legal Standard.

"FOIA cases typically and appropriately are decided on motions for summary judgment." *100Reporters LLC v. Dep't of Justice*, 248 F.Supp.3d 115, 132 (D.D.C. 2017) (quoting *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In a FOIA suit, an agency is entitled to summary judgment once it bears its burden of demonstrating that no material facts are in dispute and that all information that falls within the class requested either has been produced, is unidentifiable, or is exempt from disclosure." *Isasi v. Office of Atty. Gen.*, 594 F. Supp. 2d 12, 14 (D.D.C. 2009) (quoting *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C.Cir.2001) and *Weisberg v. Dep't of Justice*, 627 F.2d 365, 368 (D.C.Cir.1980)). Once the court determines that an agency has released all non-exempt material, it has no further judicial function to perform under FOIA, and the FOIA claim is moot. *Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982); *Muhammad v. U.S. Customs & Border Prot.*, 559 F. Supp. 2d 5, 7-8 (D.D.C. 2008).

B.  **NHTSA's Search For Responsive Records Was Reasonably Calculated to Locate all Responsive Records.**

QCS's Complaint is based solely upon its allegation that that DOT "wrongfully withheld the requested records from plaintiff by failing to comply with the statutory time limit." *See* Complaint at ¶ 11. However, NHTSA has since responded to QCS's FOIA request, notifying the company that it had identified responsive records, but that the records were being withheld under Exemption 4.[3] *See* SMF ¶ 17; Exhibit 9. QCS cannot sustain any challenge to the adequacy of NHTSA's search for responsive records.

For DOT to demonstrate that its search was adequate, it must show that it has made "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (the Agency must show "beyond material doubt that its search was reasonably calculated to uncover all relevant documents."). The reasonableness of an agency's search may rest, in part, on whether the agency properly determined where responsive records were likely to be located and then searched those locations. *See Antonielli v. U.S. Parole Comm'n*, 2009 WL 1497186, at *4 (D.D.C. May 29, 2009). In demonstrating that it has performed an adequate search, the Agency must offer a "reasonably detailed" affidavit that "set[s] forth the search terms and the type of search performed, and aver[s] that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68.

---

[3]Since DOT has now responded to QCS's FOIA request and because Plaintiff's Complaint appears to be entirely predicated on QCS's failure to respond, DOT maintains that the Complaint may also be dismissed as moot. *See Crooker v. United States State Department*, 628 F.2d 9, 10 (D.C.Cir.1980).

QCS's FOIA request is relatively narrow, seeking only the backup data for the Figure 11 calculation. In support of its Motion, NHTSA has provided a Declaration of Jeffrey L. Quandt, the ODI Division Chief overseeing the Tesla investigation. Mr. Quandt provided a detailed explanation of the data used to calculate the rates in Figure 11 and NHTSA's search for responsive records. *See* Exhibit A at ¶¶ 17, 20-23. He also averred that he searched all files likely to contain responsive material. *See id.* at ¶ 22. Mr. Quandt's search was reasonable given his role as the primary author of the January 19, 2017 closing report and as the individual who performed the calculation for Figure 11. *See id.* at ¶¶ 14-16. He alone knew what information he relied upon to calculate the rates (*i.e.*, the Access database) and he alone knew what information he did not rely upon (*e.g.*, statistical summaries, formulas, models, adjustments, sample weights). He also knew where the documents would most likely be located, having used them recently in preparing the closing report. As a result, NHTSA "properly determined where responsive records were likely to be located and then searched those locations."

### C. The Requested Records Are Exempt From Disclosure Pursuant to FOIA Exemption 4.

While the Complaint raises no allegations related to the sufficiency of NHTSA's response, even if it could be construed as challenging NHTSA's decision to withhold responsive documents, DOT is still entitled to judgment as a matter of law. "In a suit brought to compel production, an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates "that each document that falls within the class requested either has been produced ... or is wholly exempt from the Act's inspection requirements." *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (quotations omitted). To meet its burden of demonstrating that the records are exempt from disclosure, a defendant agency may rely on a declaration or *Vaughn* index, so long as it is relatively detailed and non-conclusory.

*100Reporters*, 248 F.Supp.3d at 132. Further, the agency's justification for invoking a FOIA exemption will be deemed sufficient if it appears "logical" or "plausible." *See Id.* (quoting *Wolf v. C.I.A.*, 473 F.3d 370, 374-75 (D.C. Cir. 2007)); *see also Skybridge Spectrum Found. v. F.C.C.*, 842 F. Supp. 2d 65, 82 (D.D.C. 2012). Here, NHTSA's decision to withhold responsive records under Exemption 4 was logical and plausible, especially in light of the information provided to the agency in Tesla's request for confidential treatment, and it is further supported by the attached Vaughn Index. *See* Exhibit 3.

In its request for confidential treatment for the August 8, 2016, submission (including the Access database), Tesla claimed:

> The information provided in the PE 16-007 Initial Information Submission is entitled to confidential treatment under 5 U.S.C. § 552(b)(4), as modified pursuant to 49 U.S.C. § 32910, and NHTSA regulations at 49 C.F.R. § 512 because release of this information would cause substantial competitive harm to Tesla. The information includes specific business and technical information regarding Tesla's vehicles, its software, and the Company's methods of evaluating vehicle issues. If released, such information would cause substantial competitive harm to Tesla by revealing to competitors information about Tesla's proprietary operations and technology not otherwise available outside of the Company. Such information is commercially valuable to competitors because it provides them with additional insight on how to improve their own business processes in identifying problems and tracking their vehicle performance. Competitors could use this information to gain knowledge about Tesla's operations and evaluation of events that would have otherwise required significant expenditure, resulting in cost savings.

Exhibit 4 at p. 2. With respect to log data, Tesla further elaborated that "[i]t would be of great interest to competitors to understand the minutiae of data that Tesla collects regarding all of its vehicles, as well as how it analyzes that data." *Id* at p. 3.

Generally, an agency may withhold records under Exemption 4 that are comprised of commercial or financial information; obtained from a person; and privileged or confidential. 5 U.S.C. § 552(b)(4). Under *National Parks*, information is considered confidential if disclosure is

likely "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." 498 F.2d at 770.

NHTSA reviewed Tesla's confidentiality request and concluded that because Tesla's submission had been involuntary – *i.e.*, in response to ODI's information request – the *National Parks & Conservation Assoc. v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) standard was applicable. Exhibit 5 at 1. In applying this test, NHTSA agreed that release of the information submitted by Tesla was "likely to cause competitive harm." *Id*. Additionally, NHTSA noted that "Tesla has taken measures to ensure that the material is not public and has not been publicly released." *Id.* Thus, NHTSA granted Tesla's request for confidential treatment on July 5, 2017. *Id*.

NHTSA was correct in granting Tesla's confidentiality request because the Access database contains commercial information. It is comprised of information collected remotely by Tesla from its vehicles in the field, which information Tesla uses to improve its products and services, among other things. *See* Tesla's Customer Privacy Policy *available at* https://www.tesla.com/about/legal (last visited October 10, 2017) (explaining the information Tesla may collect from its vehicles and how it may use that information). Such information is commercial in nature because it relates to an income-producing aspect of Tesla's business (*i.e.*, its products and services) and Tesla therefore has a commercial interest in that information. *See Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006).

Second, the Access database was obtained from a person – *i.e.*, Tesla. FOIA defines person broadly to "include[ ] an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2*); see also Judicial Watch, Inc. v. Exp.–Imp. Bank*, 108 F.Supp.2d 19, 28 (D.D.C. 2000) ("[T]he term 'person' in the context of

Exemption 4 applies to a wide range of entities ...."). As a corporation, Tesla clearly meets the definition of a "person."

Third, the information is confidential because release of the withheld information is likely to "cause substantial harm to the competitive position of the person from whom the information was obtained." *National Parks,* 498 F.2d at 770. Here, in its request for confidential treatment, Tesla has claimed that release of the information would cause substantial competitive harm "by revealing to competitors information about Tesla's proprietary operations and technology not otherwise available outside of the Company," which is "commercially valuable to competitors because it provides them with additional insight on how to improve their own business processes in identifying problems and tracking their vehicle performance." Exhibit 4 at p. 2. NHTSA agrees.

In the race to roll out fully-functional autonomous vehicles, big data is invaluable.[4] Tesla has a competitive advantage in this space given its position as the sole manufacturer performing real world beta-testing of autonomous technologies on a fleet of tens of thousands of vehicles. No other manufacturer comes close to testing its technologies on that scale.[5] Tesla's vehicles data provides a rich source of information, which the company can and does use to adapt and improve its products. If such data is publicly released, it is quite probable that competitors would mine the data to improve their own products, most likely to Tesla's detriment. Because it is therefore likely that Tesla would suffer substantial competitive harm if the Access database were

---

[4] NHTSA is not alone in this view. *See, e.g.*, https://www.bloomberg.com/news/articles/2016-12-20/the-tesla-advantage-1-3-billion-miles-of-data (last visited Oct. 10, 2017).

[5] For example, General Motor's self-driving unit, Cruise Automation, recently doubled the size of its test fleet in California to 100 vehicles. *See* https://www.reuters.com/article/us-autos-selfdriving-crashes/gm-more-than-doubles-self-driving-car-test-fleet-in-california-idUSKBN1C92VD (last visited Oct. 10, 2017).

publicly released, such information is confidential commercial information exempt from FOIA's disclosure requirements.

Finally, there are no reasonably segregable portions of the requested records that could be released to QCS. Tesla requested confidential treatment for the entire Access database. Exhibit 3; Exhibit 4. After reviewing Tesla's confidentiality request and examining the documents at issue, NHTSA Chief Counsel's Office determined, among other things, that the entire Access database was entitled to confidential treatment. *See* SMF ¶ 15; Exhibit 5. Thus, there was nothing left to segregate.[6] *See Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 371-72 (D.C. Cir. 2005). Similarly, because Mr. Quandt's Microsoft Excel file contains an analysis of the confidential information from the Microsoft Access database, there was no nonexempt information to segregate in that file either. See Exhibit A at ¶¶ 17-18. Therefore, it was appropriate for NHTSA to withhold the two responsive records in their entirety.

### D. The Requested Records Are Also Exempt From Disclosure Pursuant to FOIA Exemptions 5 and 6.

Although NHTSA's FOIA response only cited Exemption 4, both responsive records contain personally identifiable information covered by Exemption 6 (i.e., Vehicle Identification Numbers). *See* 5 U.S.C. § 552(b)(6); *see also* 69 FR 21409, 21416 (explaining NHTSA's rationale for considering VINs protected under Exemption 6). In addition, one of the withheld records is covered by Exemption 5: the Excel file titled "PE16_007_PRODUCTION DATA_jlq_working_file_10Jan2017." *See* U.S.C. § 552(b)(5). The Excel file contains Mr. Quandt's work product, including his decisions about how to look at Tesla's data, how to select

---

[6] To the extent any of the information in the Access database could be considered nonexempt, such information would be such a small percentage of the overall information produced and would be so intertwined with the exempt information as to render any redacted document unintelligible. *See Mead Data Center, Inc. v. U.S. Dept. of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).

portions of it to examine, and how to interpret it. While the Excel file contains factual data that might not otherwise be considered deliberative, the use of the data by Mr. Quandt in evaluating the Autopilot system and writing the closing report renders the Excel file part of NHTSA's deliberative process. *See Reliant Energy Power Generation, Inc. v. F.E.R.C.*, 520 F. Supp. 2d 194, 206 (D.D.C. 2007). Therefore, it was appropriate for NHTSA to withhold responsive records under Exemptions 5 and 6, as well as Exemption 4.

### IV.     CONCLUSION

QCS cannot dispute that NHTSA responded to its FOIA request on July 21, 2017. Therefore, its claims are moot and should be dismissed. Moreover, because NHTSA's search for responsive records was adequate and the agency properly withheld the requested records under Exemption 4, there is nothing further for the court to adjudicate. Accordingly, this Court should grant summary judgment in favor of DOT.

Respectfully submitted,

JESSIE K. LIU, D.C. Bar #4472845
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

By: _____/s/_____
CLAIRE WHITAKER, Bar # 354530
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2526 (office)
Claire.Whitaker@usdoj.gov

OF COUNSEL:

Elizabeth H. Mykytiuk
Senior Trial Attorney, Litigation and Enforcement
Department of Transportation
National Highway Traffic Safety Administration