**Exhibits 1-9**

Referenced in:

Exhibit A

(Declaration of Jeffrey Quant)

and

Exhibit B

(Declaration of Otto G. Matheke, III)

# Exhibit 1



**U.S. Department of Transportation**

**National Highway Traffic Safety Administration**

# ODI  RESUME

| | |
|---|---|
| **Investigation:** | PE 16-007 |
| **Date Opened:** 06/28/2016 | |
| **Investigator:** Kareem Habib | **Date Closed:** 01/19/2017 |
| **Approver:** Stephen Ridella | **Reviewer:** Jeff Quandt |
| **Subject:** Automatic vehicle control systems | |

## MANUFACTURER & PRODUCT INFORMATION

| | |
|---|---|
| **Manufacturer:** | Tesla Motors, Inc. |
| **Products:** | MY2014-2016 Tesla Model S and Model X |
| **Population:** | 43,781 |

| | |
|---|---|
| **Problem Description:** | The Automatic Emergency Braking (AEB) or Autopilot systems may not function as designed, increasing the risk of a crash. |

## FAILURE REPORT SUMMARY

| | ODI | Manufacturer | Total |
|---|---|---|---|
| **Complaints:** | 0 | 0 | 0 |
| **Crashes/Fires:** | 0 | 0 | 0 |
| **Injury Incidents:** | 0 | 0 | 0 |
| **Fatality Incidents:** | 0 | 0 | 0 |

## ACTION / SUMMARY INFORMATION

**Action:**   This Preliminary Evaluation is closed.

**Summary:**

On May 7, 2016, a 2015 Tesla Model S collided with a tractor trailer crossing an uncontrolled intersection on a highway west of Williston, Florida, resulting in fatal injuries to the Tesla driver.  Data obtained from the Model S indicated that:  1) the Tesla was being operated in Autopilot mode at the time of the collision; 2) the Automatic Emergency Braking (AEB) system did not provide any warning or automated braking for the collision event; and 3) the driver took no braking, steering or other actions to avoid the collision.  On June 28, 2016, NHTSA opened PE16-007 to "examine the design and performance of any automated driving systems in use at the time of the crash."

The Office of Defects Investigation (ODI) analyzed the following subjects as part of NHTSA's examination of the design and performance of Tesla's Autopilot system:  1) Automatic Emergency Braking (AEB) system design and performance in the subject Tesla and peer vehicles; 2) human-machine interface issues related to Autopilot operating mode; 3) data from crash incidents related to Tesla's Autopilot and AEB systems; and 4) changes Tesla has implemented in the Autopilot and AEB systems.

NHTSA's examination did not identify any defects in the design or performance of the AEB or Autopilot  systems of the subject vehicles nor any incidents in which the systems did not perform as designed.  AEB systems used in the automotive industry through MY 2016 are rear-end collision avoidance technologies that are not designed to reliably perform in all crash modes, including crossing path collisions.  The Autopilot system is an Advanced Driver Assistance System (ADAS) that requires the continual and full attention of the driver to monitor the traffic environment and be prepared to take action to avoid crashes.  Tesla's design included a hands-on the steering wheel system for monitoring driver engagement.  That system has been updated to further reinforce the need for driver engagement through a "strike out" strategy.  Drivers that do not respond to visual cues in the driver monitoring system alerts may "strike out" and lose Autopilot function for the remainder of the drive cycle.

A safety-related defect trend has not been identified at this time and further examination of this issue does not appear to be warranted.  Accordingly, this investigation is closed.  The closing of this investigation does not constitute a finding by NHTSA that no safety-related defect exists.  The agency will monitor the issue and reserves the right to take future action if warranted by the circumstances.  For more information about the analysis, see the attached report.

## 1.0 INTRODUCTION

On May 7, 2016, a 2015 Tesla Model S collided with a tractor trailer crossing an uncontrolled intersection on a highway west of Williston, Florida, resulting in fatal injuries to the Tesla driver.  Data obtained from the Model S indicated that:  1) the Tesla was being operated in Autopilot mode at the time of the collision; 2) the Automatic Emergency Braking (AEB) system did not provide any warning or automated braking for the collision event; 3) the driver took no braking, steering or other actions to avoid the collision; and 4) the last recorded driver action was increasing the cruise control set speed to 74 mph less than two minutes prior to impact.  The crash occurred on a clear day with dry road conditions.  On June 21, 2016, NHTSA deployed a Special Crash Investigations team to the crash site to evaluate the vehicle and study the crash environment.  NHTSA's crash reconstruction indicates that the tractor trailer should have been visible to the Tesla driver for at least seven seconds prior to impact.  On June 28, 2016, NHTSA opened PE16-007 to "examine the design and performance of any automated driving systems in use at the time of the crash."

The Office of Defects Investigation (ODI) analyzed the following subjects as part of NHTSA's examination of the design and performance of Tesla's Autopilot system:  1) AEB design and performance in the subject Tesla and peer vehicles; 2) human-machine interface issues related to Autopilot operating mode; 3) data from crash incidents related to Tesla's Autopilot and AEB systems; and 4) changes Tesla has implemented in the Autopilot and AEB systems.

## 2.0 AEB SYSTEM

**2.1 AEB technologies.**  Automatic Emergency Braking includes the following crash avoidance technologies:  Forward Collision Warning (FCW), Dynamic Brake Support (DBS), and Crash Imminent Braking (CIB).  An FCW is presented to the driver if the system predicts a crash with an object in the vehicle's forward path is imminent.  To be effective, such alerts are provided with sufficient lead-time for the driver to assess the potential hazard, and to respond with the appropriate braking or steering needed to avoid the crash.  If the driver chooses to avoid the crash by braking, but does not apply sufficient braking to do so, DBS automatically supplements their application.  If the driver does not take action to avoid the crash, CIB automatically applies the vehicle's brakes so that it may be mitigated or avoided.

**2.2 Background.**  AEB technologies have been in use for over 10 years.  In September 2007, a NHTSA-sponsored project was initiated by the Crash Avoidance Metrics Partnership (CAMP) "to develop test methods for evaluating crash imminent braking systems and to establish benefits estimation methods for assessing their effectiveness at reducing the severity of potential injuries in vehicle crashes."[1] The final report from this project, released in September 2011, validated the effectiveness of radar, camera and radar/camera fusion systems as rear-end collision mitigation or avoidance technologies.[2]  The report also identified several crash modes that were not validated by the project, including straight crossing path (SCP)[3] and left turn across path (LTAP) collisions:

---

[1] Crash Imminent Braking (CIB) First Annual Report. (2010). DOT HS 811 340. National Highway Traffic Safety Administration. Washington, DC.
[2] Objective Tests for Imminent Crash Automatic Braking Systems Final Report Volume 1 of 2. (2011). DOT HS 811 521. National Highway Traffic Safety Administration. Washington, DC.
[3] The classic example of an SCP crash is a laterally approaching vehicle in a traffic intersection.  Challenges associated with these crash modes increase as speeds of target and/or host vehicle increase.

*The test methods representing **<u>Straight Crossing Path</u>** [emphasis added], Left Turn Across – Opposite Direction, Opposite Direction, and pole/tree crash scenarios were all designated as 'Test Method Not Validated – Beyond Scope of CIB Project.' While test scenarios were developed and demonstrated for these crash conditions, CIB system performance, regardless of system configuration or settings, were not capable of reliably responding to these tests. Due to the difficulty in predicting the pre-crash events that lead up to these crash types, the difficulty in balancing CIB activations for these crashes with potential increases in undesirable false activation, and many other factors, these scenarios are also not likely to be near-term deployable features of CIB systems and may be better addressed through other active safety technologies.*[4]

Figure 1 shows a straight crossing path test conducted as part of the CIB project.  The report provides the following assessment of the test result, "The limited time the target is in the field of view prior to impact challenges the system's ability to perform threat assessment and apply the CIB system. A target is usually recognized very late or not at all prior to impact."[5]



***Figure 1. CIB Project Straight Crossing Path Test Scenario.***

Since model year (MY) 2010, NHTSA has conducted testing of FCW system performance as part of its New Car Assessment Program (NCAP).  The tests include the rear-end collision crash modes validated by the CIB project:  Lead Vehicle Stopped (LVS), Lead Vehicle Moving (LVM), and Lead Vehicle Decelerating (LVD).  On November 5, 2015, the agency announced it would be adding AEB system evaluations to NCAP effective for the 2018 model year.  In March 2016, NHTSA issued a joint statement with the Insurance Institute for Highway Safety (IIHS) providing information related to the commitment

---

[4] Objective Tests for Imminent Crash Automatic Braking Systems Final Report Volume 1 of 2, page 84 (2011). DOT HS 811 521. National Highway Traffic Safety Administration. Washington, DC.
[5] Objective Tests for Imminent Crash Automatic Braking Systems Final Report Volume 2 of 2, page L-51 (2011). DOT HS 811 521A. National Highway Traffic Safety Administration. Washington, DC.

by 20 automobile manufacturers, representing 99 percent of the U.S. new-car market, to voluntarily make AEB "standard on virtually all light-duty cars and trucks with a gross vehicle weight of 8,500 lbs. or less no later than September 1, 2022, and on virtually all trucks with a gross vehicle weight between 8,501 lbs. and 10,000 lbs. no later than September 1, 2025."  The predicted safety benefits cited in the statement are limited to rear-end crashes:

> IIHS research shows that AEB systems meeting the commitment would reduce **_rear-end crashes_** [emphasis added] *by 40 percent. IIHS estimates that by 2025 – the earliest NHTSA believes it could realistically implement a regulatory requirement for AEB – the commitment will prevent 28,000 crashes and 12,000 injuries.*[6]

The capabilites of AEB systems have continually improved in performance and capabilities as automobile manufacturers and suppliers refine sensor packages and the algorithms that perform the object classifications and make the braking decisions (e.g., pedestrian collision avoidance).  Recognizing this, ODI surveyed a dozen automotive manufacturers and several major suppliers to determine if the AEB capabilities in crossing path collisions had changed since the CAMP CIB project was completed.  None of the companies contacted by ODI indicated that AEB systems used in their products through MY 2016 production were designed to brake for crossing path collisions.

**2.3 Tesla AEB system.**  The Tesla AEB system is a radar/camera fusion system that is functional when switched ON regardless of Autopilot status.  The driver can switch AEB ON/OFF on the Driver Assist page accessible via a display mounted in the center of the dashboard.  The AEB is default ON for each new ignition cycle.  The driver can select the timing of FCW alerts with four options:  Early, Medium, Late, or OFF.  If FCW is OFF, the driver will still get a Brake Capacity Warning (BCW) when driving in Traffic-Aware Cruise Control (TACC) mode (see Section 3 below).  BCW alerts the driver when the closing speed to a lead vehicle may be too great to avoid a collision with the standard TACC deceleration limits.  Adjusting the timing of the FCW alert does not affect the activation timing of the Tesla AEB system.

Both the radar and camera sub-systems are designed for front-to-rear collision prediction mitigation or avoidance.[7]  The system requires agreement from both sensor systems to initiate automatic braking.  The camera system uses Mobileye's EyeQ3 processing chip which uses a large dataset of the rear images of vehicles to make its target classification decisions.  Complex or unusual vehicle shapes may delay or prevent the system from classifying certain vehicles as targets/threats.

NHTSA conducted a series of test track-based AEB performance evaluations shortly after the May crash using a 2015 Tesla Model S 85D and a 2015 Mercedes C300 4Matic peer vehicle.  The vehicles were tested in the three rear-end collision crash modes (LVS, LVM, and LVD) and three different vehicle operating modes:  manual driving; adaptive cruise control (ACC) systems activated; and ACC and Lane Centering Control (LCC) systems activated.  This testing confirmed that the AEB systems in the Tesla and peer vehicle were able to achieve crash avoidance in a majority of the rear-end scenarios tested; that ACC generally provided enough braking to achieve crash avoidance without also requiring CIB to

---

[6] Fact Sheet, Auto Industry Commitment to IIHS and NHTSA on Automatic Emergency Braking. (2016). National Highway Traffic Safety Administration & Insurance Institute for Highway Safety. Washington, DC.
[7] The system is also designed to detect and avoid impacts with pedestrians and stationary objects in the path of the Tesla when operating with TACC enabled.

intervene; and that neither vehicle effectively responded to a realistic appearing artifical "target" vehicle in the SCP or LTAP scenarios.

ODI's analysis of Tesla's AEB system finds that 1) the system is designed to avoid or mitigate read-end collisions; 2) the system's capabilities are in-line with industry state of the art for AEB performace through MY 2016; and 3) braking for crossing path collisions, such as that present in the Florida fatal crash, are outside the expected performance capabilities of the system.[8]

## 3.0 AUTOPILOT

The Autopilot system is an advanced driver assistance system (ADAS), which controls vehicle speed and path by automated control of braking, steering and torque to the drive motors.[9]  Figure 2 shows the components used by Autopilot to monitor the driving environment.[10]  The major subsystems associated with operation in Autopilot mode are TACC and Autosteer.



*Figure 2. 2016 Tesla Model S Driver Assistance Sensors (left) and Fields of View (right).*

**3.1 Traffic-Aware Cruise Control (TACC).**  The Tesla TACC system uses information from the forward looking camera and radar sensor to determine if there is a vehicle in front of the Tesla in the same lane.  If there is no vehicle in front of the Tesla, TACC maintains a set driving speed selected by the driver.  When there is a lead vehicle detected that is travelling slower that the Tesla's set speed, the TACC will control motor torques to maintain a selected time-based distance from the lead vehicle.

The Tesla Model S owner's manual states that TACC "is primarily intended for driving on dry, straight roads, such as highways and freeways. It should not be used on city streets."  The manual includes several additional warnings related to system limitations, use near pedestrians and cyclists, and use on winding roads with sharp curves or with slippery surfaces or poor weather conditions.  The system does not prevent operation on any road types.

**3.2 Autosteer.**  The Tesla Autosteer system uses information from the forward-looking camera, the radar sensor, and the ultrasonic sensors, to detect lane markings and the presence of vehicles and objects

---

[8] Object classification algorithms in the Tesla and peer vehicles with AEB technologies are designed to avoid false-positive brake activations.  The Florida crash involved a target image (side of a tractor trailer) that would not be a "true" target in the EyeQ3 vision system dataset and the tractor trailer was not moving in the same longitudinal direction as the Tesla, which is the vehicle kinematic scenario the radar system is designed to detect.

[9] NHTSA recognizes that other jurisdictions have raised concerns about Tesla's use of the name "Autopilot."  This issue is outside the scope of this investigation.

[10] 2016 Tesla Model S Owner's Manual

to provide automated lane-centering steering control based on the lane markings and the vehicle directly in front of the Tesla, if present. The Tesla owner's manual contains the following warnings: 1) "Autosteer is intended for use only on highways and limited-access roads with a fully attentive driver. When using Autosteer, hold the steering wheel and be mindful of road conditions and surrounding traffic. Do not use Autosteer on city streets, in construction zones, or in areas where bicyclists or pedestrians may be present. Never depend on Autosteer to determine an appropriate driving path. Always be prepared to take immediate action. Failure to follow these instructions could cause serious property damage, injury or death;" and 2) "Many unforeseen circumstances can impair the operation of Autosteer. Always keep this in mind and remember that as a result, Autosteer may not steer Model S appropriately. Always drive attentively and be prepared to take immediate action."  The system does not prevent operation on any road types.

## 4.0 HUMAN MACHINE INTERFACE

**4.1 Automation Level.**  The Tesla Autopilot system is a Level 1 automated system when operated with TACC enabled and a Level 2 system when Autosteer is also activated.  Figure 3 shows a summary of the levels of driving automation for on-road vehicles, including the division of responsibility at each level for the driver and system.[11]  Level 1 and 2 system require continuous attention by the operator to monitor the driving environment and take immediate control when necessary.  It is important that operators recognize this responsibility and understand the capabilities and limitations of the system.

| SAE level | Name | Narrative Definition | Execution of Steering and Acceleration/ Deceleration | Monitoring of Driving Environment | Fallback Performance of Dynamic Driving Task | System Capability (Driving Modes) |
|---|---|---|---|---|---|---|
| *Human driver monitors the driving environment* | | | | | | |
| 0 | No Automation | the full-time performance by the *human driver* of all aspects of the *dynamic driving task,* even when enhanced by warning or intervention systems | Human driver | Human driver | Human driver | n/a |
| 1 | Driver Assistance | the *driving mode*-specific execution by a driver assistance system of either steering or acceleration/deceleration using information about the driving environment and with the expectation that the *human driver* perform all remaining aspects of the *dynamic driving task* | Human driver and system | Human driver | Human driver | Some driving modes |
| 2 | Partial Automation | the *driving mode*-specific execution by one or more driver assistance systems of both steering and acceleration/ deceleration using information about the driving environment and with the expectation that the *human driver* perform all remaining aspects of the *dynamic driving task* | System | Human driver | Human driver | Some driving modes |
| *Automated driving system ("system") monitors the driving environment* | | | | | | |
| 3 | Conditional Automation | the *driving mode*-specific performance by an *automated driving system* of all aspects of the dynamic driving task with the expectation that the *human driver* will respond appropriately to a *request to intervene* | System | System | Human driver | Some driving modes |
| 4 | High Automation | the *driving mode*-specific performance by an automated driving system of all aspects of the *dynamic driving task,* even if a *human driver* does not respond appropriately to a *request to intervene* | System | System | System | Some driving modes |
| 5 | Full Automation | the full-time performance by an *automated driving system* of all aspects of the *dynamic driving task* under all roadway and environmental conditions that can be managed by a human driver | System | System | System | All driving modes |

*Figure 3. Summary of SAE International's Levels of Driving Automation for On-Road Vehicles.*

The design of Level 2 partial autonomous systems should consider human-machine interface design factors, including:[12]  1) provide the operator with information about system limitations; 2) include a method for monitoring driver engagement with the driving task and assisting the driver with maintaining

---

[11] https://www.sae.org/misc/pdfs/automated_driving.pdf

[12] Human Factors Evaluation of Level 2 and Level 3 Automated Driving Concepts – Concepts of Operation. (2014). DOT HS 812 044. National Highway Traffic Safety Administration. Washington, DC.

attention to the environment; 3) minimize the potential for mode confusion to occur, through intuitive feedback from vehicle dynamics and/or warnings to the driver; and 4) consider restricting availability or performance when used on roads that are not in the intended use operating environments.

**4.2 System limitations.**  Tesla provides information about system limitations at multiple levels, including:  1) the owner's manual; 2) in the release notes for new software releases, which refer to the owner's manual; 3) a user agreement required before enabling Autosteer for the first time or after an ignition cycle that concluded with Autosteer being switched off; 4) a dialog box that appears every time Autosteer is activated reminding the driver to "Always keep your hands on the wheel" and "Be prepared to take over at any time" (Figure 4); 5) the information in the user interface, which appears at all times while driving - the blue shaded circle around the white steering wheel indicates Autosteer is in operation, as opposed to when the background is gray meaning Autosteer is available should the driver decide to enable it (Figure 5).



*Figure 4. Dialog Box that Appears Every Time Autosteer is Activated.*



*Figure 5. Autopilot User Interface showing System Perceived Lane Lines, Other Vehicles, and Ultrasonic Objects.*

**4.3 Driver monitoring.** Tesla monitors driver engagement[13] through the interactions with the steering wheel, turn signal, and TACC speed setting stalk.  If the system does not detect the driver's hands on the steering wheel (assessed using microtorque measurements) or other signs of driver engagement for periods of time that vary depending on road class, vehicle speed, road curvature, and traffic conditions, an escalating series of warnings is presented.  The warnings start with a visual alert indicating that hands on the steering wheel are required.  If the driver does not respond to the visual warning, an audible chime is sounded after 15 seconds.  A more pronounced chime is initiated if the driver does not respond after another 10 seconds.  If the driver fails to respond to the third alert stage within five seconds, the system gradually slows the vehicle while maintaining position in the lane.  Once the driver's hands are detected on the steering wheel, the warnings are suspended and Autopilot operation resumes.

As part of Tesla's 8.0 over-the-air (OTA) software update in September 2016, Tesla revised the timing of the hands-on warnings and added a feature that takes away the Autopilot driving feature for the remainder of the drive cycle if the driver fails to respond to the alerts adequately (known as an "Autopilot strikeout" – Figure 6).



*Figure 6. Autosteer "Strike-Out" Alert.*

**4.4 Mode confusion.**  Unexpected system response during attempted activation or inadvertent override of Autosteer may leave the operator unaware of the state of the vehicle (i.e., "mode confusion").  Tesla's design is intended to protect against mode confusion at several levels, including:  1) information available in the user interface regarding Autopilot availability, Autopilot state, and successful and failed transitions between states; 2) providing audiovisual "Take Over Immediately" warning whenever the vehicle crosses a lane line or road edge, while the driver's hands are not detected on the steering wheel, within 40 seconds of an unsuccessful activation of Autosteer or an Autosteer override; and 3) if the driver attempts to activate TACC and Autosteer with a double-pull of the cruise stalk when Autosteer is not

---

[13] Driver engagement refers to the driver's engagement in monitoring the driving environment and being prepared to take immediate action to avoid collisions, if necessary.

available, neither feature will activate and the Autosteer indicator icon will flash orange (Figure 7) and an audible alert will sound.



*Figure 1. Unsuccessful Autosteer Activation Alert.*

**4.5 Road restrictions.**  According to Tesla, Autosteer is designed for use on highways that have a center divider and clear lane markings.  The system does not prevent operation on any road types.  The driver is responsible for deciding when the road type and other conditions are appropriate for system activation.  The hands-on warnings occur more frequently as a function of vehicle speed, road class, and existence of heavy traffic.

## 5.0 CRASH INCIDENTS

**5.1 Autopilot crashes.**  ODI analyzed data from crashes of Tesla Model S and Model X vehicles involving airbag deployments that occurred while operating in, or within 15 seconds of transitioning from, Autopilot mode.[14]  Some crashes involved impacts from other vehicles striking the Tesla from various directions with little to no warning to the Tesla driver.  Other crashes involved scenarios known to be outside of the state-of-technology for current-generation Level 1 or 2 systems, such as cut-ins, cut-outs and crossing path collisions.



*If a vehicle driving ahead of you suddenly swerves into your lane, the system may not be able to automatically restore the selected distance. This also applies to major speed differences to vehicles driving ahead of you, e.g., when rapidly approaching a truck.*

2016 BMW 7-Series Owner's Manual, page 174

*Figure 8. ACC Cut-In Scenario Warning. 2016 BMW 7-Series Owner's Manual.*



⚠ **WARNING**

If ACC changes targets from a moving vehicle to a stationary one at speeds **above** 20 mph (30 km/h), the system will **not** react to the stationary vehicle and will accelerate to the previously set speed.

The driver must actively apply the brakes to slow/stop the vehicle.

*Figure 9. ACC Cut-Out Scenario Warning, 2016 Volvo XC90 Owner's Manual.*

---

[14] Data logs, image files, and records related to the crashes were provided by Tesla in response to NHTSA subpoenas.

Figures 8 and 9 show examples of warnings from peer vehicle owner's manuals indicating that these modes are challenging for ACC systems, in Level 1 or 2 operating modes, and may require action by the driver to avoid a collision. Similarly, in discussing ACC, the BMW manual describes system limitations, including that the system does not decelerate for cross traffic. [15]

**5.2 Driver behavior factors.** Many of the crashes appear to involve driver behavior factors, including travelling too fast for conditions, mode confusion, and distraction. Most of these involve late steering and/or braking actions by the driver to avoid the collision, but a few do not show any actions prior to impact. Highway incidents, which accounted for a little over half of the crashes reviewed by ODI, involved cut-ins, cut-outs, and sudden changes in traffic flow. Some crashes occurred in environments that are not appropriate for semi-autonomous driving (e.g., city traffic, highway entrance/exit ramps, construction zones, in heavy rain, and road junctions/intersections).

ODI's analysis of incidents related to mode confusion did not identify a pattern of failures indicating a potential design defect. Incidents included apparent mode confusion during attempted Autopilot activations and mode confusion after inadvertant overrides. The incidents associated with each of these scenarios were isolated events that involved different sets of contributing factors. Recent changes implemented by Tesla have been made to further reduce the potential for mode confusion in the subject vehicles.[16]

The Florida fatal crash appears to have involved a period of extended distraction (at least 7 seconds). Most of the incidents reviewed by ODI involved events with much shorter time available for the system and driver to detect/observe and react to the pending collision (less than 3 seconds). An attentive driver has superior situational awareness in most of these types of events, particularly when coupled with the ability of an experienced driver to anticipate the actions of other drivers. Tesla has changed its driver monitoring strategy to promote driver attention to the driving environment.

**5.3 Driver distraction.** Figure 10 shows the distributions of off-road glances by duration that were observed in a research study by General Motors of driver behaviors in vehicles with Limited-Ability Autonomous Driving Systems (LAADS)[17] when operated in SAE Level 1 and Level 2 modes.[18] The data show distractions occur in each operating mode and that the majority occur for 3 seconds or less when driving in ACC mode or with ACC and Lane Centering Control used together. ODI's analysis of field incidents found that most of the crashes developed in less than 3-4 seconds. Distractions greater than seven seconds, such as appears to have occurred in the fatal Florida crash are uncommon, but foreseeable.

---

[15] Tesla's Model S Owner's Manual is not as specific as the examples cited here; opting instead to identify a handful of scenarios under which a vehicle may not be detected, followed by a broad warning: "The limitations described above do not represent an exhaustive list of situations that may interfere with proper operation of Collision Avoidance Assist features. These features may fail to provide their intended function for many other reasons. It is the driver's responsibility to avoid collisions by staying alert and paying attention to the area beside Model S so you can anticipate the need to take corrective action as early as possible."

[16] This review included an assessment of the user interface in the subject vehicles, which has a larger display and symbols showing system status than peer vehicles with SAE Level 1 or Level 2 technologies reviewed by ODI.

[17] LAADS are defined in the study as systems that "can control vehicle speed and steering on public roads for substantial distances and time" and "in some situations requires that the driver/operator intervene to assure a safe and comfortable trip," with the latter element accounting for the "limited-ability." The study showed that vehicles with an "ACC and perfect Lane Centering (PADS)" system may have slightly more frequent longer duration off-road glances than vehicles with "ACC and imperfect Lane Centering (LAADS)" systems.

[18] Salinger, J. Human Factors for Limited-Ability Autonomous Driving Systems. (2012). General Motors Research.



***Figure 10. Percentage of Off-Road Glances Across Driving Mode for Short, Intermediate and Long Time Bins.***

To probe the foreseeability issue further,[19] the Agency issued a Special Order to Tesla to evaluate the types of driver misuse, including driver distraction, that were considered by the company and any safeguards that were incorporated into the Autopilot design.  It appears that over the course of researching and developing Autopilot, Tesla considered the possibility that drivers could misuse the system in a variety of ways, including those identified above - i.e., through mode confusion, distracted driving, and use of the system outside preferred environments and conditions.  Included in the types of driver distraction that Tesla engineers considered are that a driver might fail to pay attention, fall asleep, or become incapactitated while using Autopilot.  The potential for driver misuse was evaluated as part of Tesla's design process and solutions were tested, validated, and incorporated into the wide release of the product.  It appears that Tesla's evaluation of driver misuse and its resulting actions addressed the unreasonable risk to safety that may be presented by such misuse.[20]

**5.4 Crash rates**.  ODI analyzed mileage and airbag deployment data supplied by Tesla for all MY 2014 through 2016 Model S and 2016 Model X vehicles equipped with the Autopilot Technology Package, either installed in the vehicle when sold or through an OTA update, to calculate crash rates by miles travelled prior to[21] and after Autopilot installation.[22]  Figure 11 shows the rates calculated by ODI for airbag deployment crashes in the subject Tesla vehicles before and after Autosteer installation.  The data show that the Tesla vehicles crash rate dropped by almost 40 percent after Autosteer installation.

---

[19] An unreasonable risks due to owner abuse that is reasonably foreseeable (i.e., ordinary abuse) may constitute a safety-related defect. *See United States v. Gen. Motors Corp.*, 518 F.2d 420, 427 (D.C. Cir. 1975) ("Wheels").

[20] Driver misuse in the context of semi-autonomous vehicles is an emerging issue and the agency intends to continue its evaluation and monitoring of this topic, including best practices for handling driver misuse as well as driver education.

[21] Approximately one-third of the subject vehicles accumulated mileage prior to Autopilot installation.

[22] The crash rates are for all miles travelled before and after Autopilot installation and are not limited to actual Autopilot use.



***Figure 11. Crash Rates in MY 2014-16 Tesla Model S and 2016 Model X
vehicles Before and After Autosteer Installation.***

## 6.0 AUTOPILOT UPDATES

Since it released Autopilot in October 2015, Tesla has made continuous updates to the system's firmware that are made available to consumers as OTA updates.  These updates have included changes to improve TACC, AEB and Autosteer performance, as well as adding new driver assistance safety features, such as In-Path Stationary Object (IPSO) braking and Pedal Misapplication Mitigation (PMM).  In September 2016, Tesla released its 8.0 firmware update which included revisions in the driver monitoring strategy, as well as several enhancements to AEB, DBS, and TACC performance.

## 7.0 CONCLUSION

Advanced Driver Assistance Systems, such as Tesla's Autopilot, require the continual and full attention of the driver to monitor the traffic environment and be prepared to take action to avoid crashes. Automated Emergency Braking systems have been developed to aid in avoiding or mitigating rear-end collisions.  The systems have limitations and may not always detect threats or provide warnings or automatic braking early enough to avoid collisions.  Although perhaps not as specific as it could be, Tesla has provided information about system limitations in the owner's manuals, user interface and associated warnings/alerts, as well as a driver monitoring system that is intended to aid the driver in remaining engaged in the driving task at all times.  Drivers should read all instructions and warnings provided in owner's manuals for ADAS technologies and be aware of system limitations.[23]  While ADAS technologies are continually improving in performance in larger percentages of crash types, a driver should never wait for automatic braking to occur when a collision threat is perceived.

NHTSA's examination did not identify any defects in design or performance of the AEB or Autopilot systems of the subject vehicles nor any incidents in which the systems did not perform as designed.  AEB

---

[23] While drivers have a responsibility to read the owner's manual and comply with all manufacturer instructions and warnings, the reality is that drivers do not always do so. Manufacturers therefore have a responsibility to design with the inattentive driver in mind. *See* Enforcement Guidance Bulletin 2016-02: Safety-Related Defects and Automated Safety Technologies, 81 Fed. Reg. 65705.

systems used in the automotive industry through MY 2016 are rear-end collision avoidance technologies that are not designed to reliably perform in all crash modes, including crossing path collisions.  Tesla appears to have recognized HMI factors, such as the potential for driver distraction, in its design process for the Autopilot system.  Tesla's design included a hands-on the steering wheel system for monitoring driver engagement.  That system has been updated to further reinforce the need for driver engagement through a "strike out" strategy.  Drivers that do not respond to visual cues in the driver monitoring system alerts may "strike out" and lose Autopilot function for the remainder of the drive cycle.

A safety-related defect trend has not been identified at this time and further examination of this issue does not appear to be warranted.  Accordingly, this investigation is closed.  The closing of this investigation does not constitute a finding by NHTSA that no safety-related defect exists.  The agency will monitor the issue and reserves the right to take future action if warranted by the circumstances.

# Exhibit 2



August 8, 2016

Jeffrey L. Quandt, Chief
Vehicle Control Division
Office of Defects Investigation
National Highway Traffic Safety Administration
1200 New Jersey Avenue, SE
Washington DC, 20590

          RE:  Tesla Motors Initial Response to PE16-007

Dear Mr. Quandt,

On behalf of Tesla Motors, Inc. ("Tesla" or "the Company"), this submission to the National
Highway Traffic Safety Administration ("NHTSA" or the "Agency") responds to Questions 1
through 4, 8, and 11 a through c of the Agency's July 8, 2016 Preliminary Evaluation PE16-007
letter ("PE 16-007") requesting information about performance of the Automatic Emergency
Braking (AEB) system and any other forward crash mitigation or forward crash avoidance
systems in Tesla motor vehicles.

Answers to the Agency's questions are set forth below.  As requested, Tesla has repeated the
applicable request verbatim above each response.  Tesla has provided responsive documents,
data, and reports dated, up to and including, July 8, 2016.  As we agreed, except where
otherwise noted, the subject vehicles have been defined as all Tesla vehicles originally sold with
Autopilot Convenience Features that have been manufactured for sale or lease in the United
States and federalized territories.

Question 0:  Provide a list of Vehicle Identification Numbers ("VINs") for all Tesla vehicles that
have been manufactured for sale or lease in the United States and federalized territories that
were not originally sold with Autopilot Convenience Features, but had Autopilot Convenience
Features activated after original sale or lease for some period of time (e.g., by means of a free
trial period or post-sale Autopilot Convenience Features activation).

Response 0:  The requested information is provided in the folder titled, "Question 0", on the USB
Flash Drive.  This folder contains a Microsoft Excel spreadsheet titled, "Question 0.xlsx," which
contains a list of the VINs of vehicles that were not originally sold with Autopilot Convenience
Features but had Autopilot Convenience Features activated after original sale or lease either

August 8, 2016
Page 2

because the features were purchased after delivery or via a free trial period.  Please note that this list was gathered using current data on August 3, 2016.  Therefore, it includes some vehicles that purchased or began a trial of Autopilot Convenience Features between July 8, 2016 and August 3, 2016.

**Question 1:**  State the number of subject vehicles Tesla has manufactured for sale or lease in the United States and federalized territories. Separately, for each subject vehicle manufactured to date by Tesla, state the following:

    a.   Vehicle identification number (VIN);

    b.   Model;

    c.   Model Year;

    d.   Date of manufacture;

    e.   Date warranty coverage commenced;

    f.   The State in the United States, or the federalized territory, where the vehicle was originally sold or leased (or delivered for sale or lease);

    g.   The date of the last data retrieval;

    h.   The mileage of the vehicle at the last data retrieval;

    i.   The date AEB software was installed on the vehicle;

    j.   The mileage of the vehicle when AEB software was installed;

    k.   The date Autosteer software was installed on the vehicle;

    l.   The mileage Autosteer software was installed on the vehicle;

    m.   The total number of "Hands on Wheel" Autosteer SLOWING warnings recorded;

    n.   The total number of AEB events recorded before Autosteer was installed;

    o.   The total number of AEB events recorded after Autosteer was installed;

    p.   Whether the vehicle experienced any airbag deployments recorded before Autosteer was installed (YES/NO); and

    q.   Whether the vehicle experienced any airbag deployments after Autosteer was installed (YES/NO).

Provide the table in Microsoft Access 2003, 2007, or a compatible format, entitled "PE16 007 PRODUCTION DATA."

**Response 1:**  The requested information is provided in the folder titled, "Question 1", on the USB Flash Drive.  This folder contains a Microsoft Access database titled "PE16 007 PRODUCTION DATA."



**Question 2:** State the number of each of the following, received by Tesla, or of which Tesla is otherwise aware, which relate to, or may relate to, the alleged defect in in the subject vehicles:

    a.  Consumer complaints, including those from fleet operators;

    b.  Field reports, including dealer field reports;

    c.  Claims against the manufacturer involving a death or injury and other notices received by the manufacturer alleging or proving that a death or injury was caused by a possible defect in a subject vehicle;

    d.  Property damage claims;

    e.  Third-party arbitration proceedings where Tesla is or was a party to the arbitration; and

    f.  Lawsuits, both pending and closed, in which Tesla is or was a defendant or codefendant.

For subparts "a" through "d," state the total number of each item (e.g., consumer complaints, field reports, etc.) separately. Multiple incidents involving the same vehicle are to be counted separately. Multiple reports of the same incident are also to be counted separately (i.e., a consumer complaint and a field report involving the same incident in which a crash occurred are to be counted as a crash report, a field report and a consumer complaint).

In addition, for items "c" through "f," provide a detailed description of the alleged problem and causal and contributing factors and Tesla's assessment of the problem, with a summary of the significant underlying facts and evidence. For items "e" and "f," identify the parties to the action, as well as the caption, court, docket number, and date on which the complaint or other document initiating the action was filed.

**Response 2:** The vehicle populations for both Responses 0 and 1 were searched for Tesla's Responses to 2, 3, and 4. The information sources for each requested category are summarized below.  The sources of the data for subparts a through d are primarily the same as those used to submit data to NHTSA when reporting under the Transportation Recall Enhancement, Accountability and Documentation ("TREAD") Act pursuant to the requirements of 49 C.F.R. Part 579. We list below the sources of data searched for each of the enumerated categories.

August 8, 2016
Page 4





NHTSA has also requested a detailed description of the alleged problem and causal and contributing factors and Tesla's assessment of the problem, with a summary of the significant underlying facts and evidence for each incident enumerated in subparts (c) through (f). ▪



**Question 3:** Separately, for each item (complaint, report, claim, notice, or matter) within the scope of your response to Request No.2, state the following information:

    a.   Tesla's file number or other identifier used;

    b.   The category of the item, as identified in Request No. 2 (i.e., consumer complaint, field report, etc.);

    c.   Vehicle owner or fleet name (and fleet contact person), address, and telephone number;

    d.   Vehicle's VIN;

    e.   Vehicle's model and model year;

    f.   Vehicle's mileage at time of incident;

    g.   Incident date;

    h.   Report or claim date;

    i.   Type of crash (e.g., rear end collision, intersection collision with crossing vehicle, pedestrian impact, etc.);

    j.   A description of all driver control actions that could have resulted in override of autonomous controls during the event;

    k.   Number of alleged injuries, if any;

    l.   Number of alleged fatalities, if any; and

    m. Tesla's assessment of the allegation and the performance of the subject system during the event.

Provide this information in Microsoft Access 2003 or 2007, or a compatible format, entitled "PE16_007_REQUESTNUMBER THREE DATA."

**Response 3:**  The requested information is provided in the folder titled, "Question 3", on the USB Flash Drive.  This folder contains a Microsoft Access database titled "PE16_007_REQUESTNUMBER THREE DATA."

**Question 4:**  Produce copies of all documents related to each item within the scope of Request No. 2, including all data logs and recorded images. Organize the documents separately by category (i.e., consumer complaints, field reports, etc.) and describe the method Tesla used for organizing the documents.

**Response 4:**  The requested information for category is provided in the folder titled, "Question 4", on the USB Flash Drive, and has been organized into the following main folders: "Consumer Complaints," "Death and Injury Reports," and "Property Damage Claims."  Within each folder are folders for each VIN containing documents related to that VIN.  Where a single VIN falls into more than one category identical VIN folders exist in more than one main folder.  In the case where a single VIN has more than one complaint, a separate folder exists for each complaint.

In identifying information relevant to this question, Tesla pulled from the following sources of information:



**Question 8:** Provide the following information for the most recent 100 AEB events available experienced by the subject vehicles to date:

   a.  The vehicle identification number of the subject vehicle;

   b.  The date and time of the incident;

   c.  Tesla's assessment of the crash type or object avoided.

**Response 8:** The requested information is provided in the folder titled, "Question 8", on the USB Flash Drive. This folder contains a Microsoft Excel spreadsheet titled "Question 8 a-c.xlsx," which contains a list of the most recent 100 AEB events including the VIN of the subject vehicle, the date and time of the incident, and Tesla's assessment of object detected.

**Question 8.1:** Provide logs and images for examples of AEB events experienced by the subject vehicles involving avoidance or mitigation of a crash with vehicles crossing the path of the subject vehicle or avoidance or mitigation of a crash with other objects that are not the front or rear of a vehicle.

**Response 8.1:**



**Question 11a-c:** Provide a spreadsheet list of all crashes occurring while operating with Autosteer activated or within 15 seconds of a transition/handoff from Autosteer to manual control. Crashes should include all events that include evidence that an impact may have occurred (e.g., airbag deployments, seat belt retractor signals, or other signals/alerts used by Tesla to indicate that a crash has occurred). Include a description of how Tesla identified crashes for this response and provide the following information for each such incident:

   a.  The vehicle identification number of the subject vehicle;

   b.  Whether the vehicle history included evidence of drive cycles with excessive "Hands on Wheel" warnings/alerts (include a definition of the criteria used to determine "excessive"); and

   c.  Date of the crash;

**Response 11a-c:**  The requested information is provided in the folder titled, "Question 11", on the USB Flash Drive.  This folder contains a Microsoft Excel spreadsheet titled "Question 11.xlsx,"

[redacted]

* * *

If you have any questions regarding the information provided in this response, you may contact me at (650) 681-5590 or mschwall@tesla.com.

Sincerely,

**Matthew Schwall, Ph.D.**
Director, Field Performance Engineering

# Exhibit 3

**Vaughn Index**

| Record Description | Number of Pages | Disposition: Withheld in Full (F) or in Part (P) | Exemption Applied (4, 5, 6) | Explanation |
|---|---|---|---|---|
| Access Database from Tesla (CBI_PE16-007_PRODUCTION DATA). Produced on a flash drive by Tesla on August 8, 2016 in response to Question 1 in NHTSA's July 8, 2016 Information Request Letter. | N/A; File Size 13,348 KB | F | 4, 6 | This document contains business and technical information regarding Tesla's vehicles, its software, and vehicle log data. Tesla requested that this information be given confidential treatment under Exemption 4 of FOIA. Tesla submitted the request in accordance with agency regulations covering such requests. See 49 CFR Part 512. Tesla described that the information could be used by competitors to gain insight on how to improve their own business processes and gain knowledge about Tesla's operations and evaluation of events that would have otherwise required significant expenditure. Based on its review of the materials, NHTSA concluded that the information was entitled to confidential treatment pursuant to Exemption 4 of FOIA.<br><br>This document also contains Vehicle Identification Number(s) (VINs) of vehicle owner[s]. A VIN consists of 17 characters, with the last 6 digits sequentially assigned by the manufacturer in the production process. The Agency has redacted the last 6 digits of VIN(s) in this document. A full VIN can be used to identify personally identifying information. For example, a complete VIN coupled with information on a commercial database, such as Westlaw, easily can be used to identify the name, address, date of birth and lien information of a vehicle owner. See 69 FR 21409, 21416. As such, the disclosure of full VIN information would jeopardize the personal privacy of individuals. Id. VINs contain personal information that falls within the category of "similar files" for Exemption 6 purposes. There is a significant privacy interest, and the public interest is not substantial because disclosure of complete VINs would not shed light on the agency's performance of its statutory duties. Even assuming the public interest qualified for the Exemption 6 balancing test, the privacy interest in nondisclosure clearly outweighs the public interest in disclosure. Therefore, if this information is released, it would constitute a clearly unwarranted invasion of personal privacy. The last six characters of the VIN data would also qualify for categorical exclusion because the PII available through the disclosure of a complete VIN is so sensitive that it fits into a genus in which the balance characteristically tips in favor of nondisclosure. |
| Excel File (PE16_007_PRODUCTION DATA_jlq_working_file_10Jan2017). ODI analysis of Tesla CBI production data | N/A; File Size 23,430 KB | F | 4, 5, 6 | This document contains business and technical information regarding Tesla's vehicles, its software, and vehicle log data. Tesla requested that this information be given confidential treatment under Exemption 4 of FOIA. Tesla submitted the request in accordance with agency regulations covering such requests. See 49 CFR Part 512. Tesla described that the information could be used by competitors to gain insight on how to improve their own business processes and gain knowledge about Tesla's operations and evaluation of events that would have otherwise required significant expenditure. Based on its review of the materials, NHTSA concluded that the information was entitled to confidential treatment pursuant to Exemption 4 of FOIA.<br><br>NHTSA also applied the (b)(5) exemption to protect internal agency deliberative information related to the investigator's work product.  Disclosure of deliberative material regarding processes and procedures would have the effect of producing public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action.<br><br>This document also contains Vehicle Identification Number(s) (VINs) of vehicle owner[s]. A VIN consists of 17 characters, with the last 6 digits sequentially assigned by the manufacturer in the production process. The Agency has redacted the last 6 digits of VIN(s) in this document. A full VIN can be used to identify personally identifying information. For example, a complete VIN coupled with information on a commercial database, such as Westlaw, easily can be used to identify the name, address, date of birth and lien information of a vehicle owner. See 69 FR 21409, 21416. As such, the disclosure of full VIN information would jeopardize the personal privacy of individuals. Id. VINs contain personal information that falls within the category of "similar files" for Exemption 6 purposes. There is a significant privacy interest, and the public interest is not substantial because disclosure of complete VINs would not shed light on the agency's performance of its statutory duties. Even assuming the public interest qualified for the Exemption 6 balancing test, the privacy interest in nondisclosure clearly outweighs the public interest in disclosure. Therefore, if this information is released, it would constitute a clearly unwarranted invasion of personal privacy. The last six characters of the VIN data would also qualify for categorical exclusion because the PII available through the disclosure of a complete VIN is so sensitive that it fits into a genus in which the balance characteristically tips in favor of nondisclosure. |

# Exhibit 4



OFFICE OF CHIEF COUNSEL
RECEIVED

2016 AUG 10  P 4: 35

August 8, 2016

Paul Hemmersbaugh
Chief Counsel
National Highway Traffic Safety Administration
1200 New Jersey Avenue, S.E.
Washington, D.C.  20590
ATTN: Otto Matheke

      RE:    Request for Confidential Treatment—Tesla Motors Inc.'s PE 16-007 Initial Information
           Submission

Dear Mr. Hemmersbaugh:

On behalf of Tesla Motors, Inc. ("Tesla" or the "Company") and pursuant to the provisions of 49 C.F.R. Part 512 and 5 U.S.C. 552(b)(4), this submission to the National Highway Traffic Safety Administration ("NHTSA" or the "Agency") hereby requests confidential treatment for all of the information in Tesla's PE 16-007 Initial Information Submission, including all information on the accompanying USB-Flash Drive.

The information contained in the PE 16-007 Initial Information Submission is proprietary and considered privileged and confidential, and has been labeled as such.  Tesla has taken measures to ensure the foregoing identified information has not been disclosed, released publicly, or otherwise become available to any person outside of the Company, except as portions of it may have been made available as necessary for the purpose of obtaining advice and assistance from counsel and other confidential advisors.  Some of the information contained in the PE 16-007 Initial Information Submission may have been released to outside consultants under binding Nondisclosure Agreements ("NDAs") or similar mechanisms.  Such disclosures do not compromise the confidential nature of the information because of the obligations of confidentiality imposed upon such advisors.  Accordingly, the Company seeks confidential treatment for all the information contained in the PE 16-007 Initial Information Submission, as marked with the phrase "Confidential Business Information."

**Competitive Harm.**  The information provided in the PE 16-007 Initial Information Submission is entitled to confidential treatment under 5 U.S.C. § 552(b)(4), as modified pursuant to 49 U.S.C. § 32910,



Tesla Motors, Inc.
3500 Deer Creek Road, Palo Alto, CA 94304
p +852 3974 0288  f +852 3974 0287

Paul Hemmersbaugh, Chief Counsel
August 8, 2016
Page 2

and NHTSA regulations at 49 C.F.R. § 512 because release of this information would cause substantial competitive harm to Tesla.  The information includes specific business and technical information regarding Tesla's vehicles, its software, and the Company's methods of evaluating vehicle issues.  If released, such information would cause substantial competitive harm to Tesla by revealing to competitors information about Tesla's proprietary operations and technology not otherwise available outside of the Company.  Such information is commercially valuable to competitors because it provides them with additional insight on how to improve their own business processes in identifying problems and tracking their vehicles' field performance.   Competitors could use this information to gain knowledge about Tesla's operations and evaluation of events that would have otherwise required significant expenditure, resulting in cost savings.  Tesla outlines the main areas that we believe are covered by this submission below.

   *Consumer Complaints.*  NHTSA has made class determinations that certain information containing process and production data essential to the manufacture of the subject are presumptively likely to result in competitive harm if disclosed to the public.  More specifically, such presumptively confidential class determinations information submitted pursuant to the Transportation Recall Enhancement, Accountability, and Documentation ("TREAD") EWR rule, including:

> "I(1) Reports and data relating to warranty claim information and warranty adjustment information for manufacturers of tires;
>
> (2) Reports and data relating to field reports, including dealer reports, product evaluation reports, and hard copies of field reports; and
>
> (3) Reports and data relating to consumer complaints.

See 49 C.F.R. Part 512, Appendix C.

Tesla's submission includes the kinds of information NHTSA classified as presumptively protected.  In particular, the data submitted for Requests 2, 3, and 4 concerns customer claims.  Although the information was not submitted to NHTSA pursuant to a routine submission of EWR data, this information is essentially identical to, and indeed may have formed the basis of, some of the Company's prior routine submissions of EWR data.  NHTSA created these categorical statutory exemptions of data because the Agency determined that they were entitled to confidential treatment under Exemption 4 of the Freedom of Information Act ("FOIA") (5 U.S.C. § 522(b)(4), as modified pursuant to 49 U.S.C. § 32910).  If NHTSA refuses to hold this same information to be confidential, the Agency would effectively be allowing information submitted pursuant to routine EWR submissions to become public, a patently unfair outcome

Paul Hemmersbaugh, Chief Counsel
August 8, 2016
Page 3

and inconsistent with prior determinations by NHTSA.  Accordingly, all of this information should be considered presumptively confidential under this regulation.

In addition, the consumer complaints data – including Repair Orders and WarpConcerns and Toolbox sessions – should be considered confidential because, as NHTSA has already noted in the context of similar EWR reporting information, releasing it would cause substantial competitive harm to Tesla.  Consumer complaint data can provide insight into Tesla owners' customer satisfaction, as well as to the perceived quality of its vehicles.  Additionally, the EWR data provide valuable insights into a given manufacturer's business practices and decision-making, including, the methods used to collect consumer complaints.  NHTSA has recognized that consumer complaints have commercial value, and reveal market responses to various aspects of vehicles and equipment.  NHTSA in fact concluded that aggregating consumer complaint data amounts to a compendium of comprehensive information on consumer complaints that can easily be used to as an unfair basis for comparison to other car-makers.  Specifically, complaints provide feedback on new features, areas requiring consumer education, and issues that could potentially require field or production adjustments, regardless of safety.  Moreover, such consumer complaint data is not publicly available, but rather is compiled at great expense by Tesla for internal, proprietary purposes.  As an emergent Company with highly sought-after technology and an innovative business plan, Tesla's vehicles and its consumer complaints hold even more interest to the broader motor vehicle market than a more traditional car manufacturer.  It is therefore extremely important to preserving the Company's business strategies that NHTSA grant confidentiality for all Tesla consumer complaint data.

*Death, Injury, and Property Damage Information.*  Tesla's Initial Submission also contains analysis of the claims and notices received regarding deaths, injuries, and property damage.  Tesla has received no formal claims, and as such these claims are not public, and so would be of great interest to our competitors.  Even where the information about the claim may be public, which it is not to Tesla's knowledge, the analysis that accompanies this submission is not.  It would be of invaluable competitive advantage to other car manufacturers to learn about how Tesla evaluates such claims.  As such, the information should remain confidential.

*Log Data.*  The log data contained in Tesla's PE 16-007 Initial Information Submission is not publicly available, but rather is compiled at great expense by Tesla for internal, proprietary purposes.  It would be of great interest to competitors to understand the minutiae of data that Tesla collects regarding all of its vehicles, as well as how it analyzes that data in response to not only customer complaints but extraordinary cases.  As such, it is imperative that such data remains confidential.

Paul Hemmersbaugh, Chief Counsel
August 8, 2016
Page 4


*Pictures.* Tesla's Initial Submission also contains pictures of vehicles. To our knowledge, these are all internal pictures, taken from vehicle logs or during subsequent investigation into cases. In such case, and even to the extent any of them has become public, these pictures are included to demonstrate how Tesla analyzes issues on a fleet-wide or individual vehicle basis.

*Personal Identifying Information.* NHTSA has stated that it will protect personally identifying information, such as name, address, telephone number, or the last six digits of any vehicle identification number ("VIN"). The submission contains VINs and personal information regarding our customers, including detailed information regarding how many of those customers have opted into Autopilot packages, customer mileage, individual customer warnings received regarding Autopilot events, and similar granular data regarding our customers personal driving habits. Tesla believes that our customers would not have intended for information about themselves or their vehicles to be released to the general public. In order to protect the personal privacy of its customers, Tesla seeks confidential treatment of this information.

\* \* \*

Based on the foregoing, we request that confidentiality be granted in perpetuity for Tesla's entire PE16-007 Initial Information Submitted, and would appreciate your notifying us of your decision as soon as practicable. Thank you for your consideration. If you have any questions regarding this request, you may contact me at (650) 681-5590.


Sincerely,

Matthew Schwall
Director, Field Performance Engineering



### CERTIFICATE IN SUPPORT OF REQUEST FOR CONFIDENTIALITY

I, Matthew Schwall, pursuant to the provisions of 49 C.F.R. 512, state as follows:

(1)        I am Director for Field Performance Engineering for Tesla Motors, Inc. ("Tesla Motors"), and I am authorized by that company to execute documents on behalf of Tesla Motors.

(2)        The information contained in Tesla Motors Inc.'s PE 16-007 Initial Information Submission, marked with "Confidential Business Information," is confidential and proprietary and is being submitted with the claim that it is entitled to confidential treatment under 5 U.S.C. § 522(b)(4), as modified pursuant to 49 U.S.C.§ 32910.

(3)        I have personally inquired of the responsible Tesla Motors personnel who have authority in the normal course of business to release the information for which a claim of confidentiality has been made to ascertain whether such information has ever been released outside of Tesla Motors.

(4)        Based upon such inquiries, to the best of my knowledge, information and belief, the information for which Tesla Motors has claimed confidential treatment has never been released or become available outside Tesla Motors except hereinafter specified: the information or portions of it may have been made available as necessary for the purpose of obtaining advice and assistance from counsel and other confidential advisers, or to outside testing laboratories and suppliers who have signed written non-disclosure agreements or to foreign regulatory bodies who have requested such information where such submissions have been provided with a request for confidential treatment.

(5)        I make no representations beyond those contained in this certificate and in particular, I make no representations as to whether this information may become available outside Tesla Motors because of unauthorized or inadvertent disclosure except as stated in paragraph 4; and

(6)        I certify under penalty of perjury that the foregoing is true and correct.  Executed on this the 8th day of August, 2016.


Matthew Schwall

TE5LA        Tesla Motors, Inc.
3500 Deer Creek Road, Palo Alto, CA 94304
p +652 3974 0288  f +652 3974 0287

# Exhibit 5



U.S. Department
of Transportation

**National Highway
Traffic Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC  20590

**JUL - 5 2017**

Matthew Schwall
Tesla Motors, Inc.
3500 Dear Creek Road
Palo Alto, CA 94304

Re:     Confidentiality Determination/PE16-007 Initial Information Submissions

Dear Mr. Schwall:

        This responds to your letter of August 8, 2016 requesting confidential treatment for
Tesla Motor, Inc.'s ("Tesla") PE-16007 Initial Information Submission.  Specifically, Tesla
requests confidential treatment for the designated information indefinitely.  Tesla describes the
submission as containing proprietary information that is privileged and confidential.  Tesla
claims that the information has not been publicly disclosed, as the only situations where
portions may have been released were under binding Nondisclosure Agreements.  Tesla
contends that disclosure of the information would cause substantial competitive harm.

        Your request is granted.

        To the extent your submission contains potentially personally identifying information
for consumers and owners of vehicles produced by your company, such potentially personally
identifying information—for example, names, addresses, telephone numbers, and the last six
digits of any VINs—are accorded confidential treatment pursuant to Exemption 6 of the
Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b).

        Because Tesla's response was required in response to NHTSA's Preliminary
Evaluation PE16-007 information request under 49 U.S.C. § 30166, I reviewed your claim of
confidential treatment under the test announced in *National Parks & Conservation Association
v. Morton*, 498 F.2d 765 (D.C. Cir. 1974).  Under this test, Exemption 4 requires a showing
that the disclosure of commercial or financial information would be likely to cause substantial
competitive harm to the information submitter or that it is likely to impair the Agency's ability
to obtain similar data in the future.

        I have reviewed your submission, including the materials that you claim are entitled to
confidential treatment and the arguments that you assert in support of your claim.  I have
determined that the information at issue is likely to cause competitive harm.  Tesla has taken
measures to ensure that the material is not public and has not been publicly released.

2

Therefore, this information is entitled to confidential treatment pursuant to Exemption 4 of FOIA, 5 U.S.C. § 552(b)(4). Subject to the conditions below, this grant of confidential treatment will remain in effect indefinitely.

This grant of confidential treatment is subject to certain conditions. The information may be disclosed under 49 CFR § 512.22 based upon newly discovered or changed facts, and you must inform the Agency of any changed circumstances that may affect the protection of the information (49 CFR § 512.10). If necessary, you will be notified prior to the release of any information under the procedures established by our regulations (49 CFR § 512.22(b)). Furthermore, this information may be disclosed if such disclosure would be in the public interest, pursuant to the procedures established in 49 CFR § 512.23.

Sincerely,

Otto G. Matheke, III
Senior Trial Attorney

# Exhibit 6



QUALITY CONTROL SYSTEMS CORPORATION

1034 PLUM CREEK DRIVE • CROWNSVILLE, MD 21032-1322
410-923-2411 • INQUIRY@QUALITY-CONTROL.US

February 24, 2017

VIA CERTIFIED MAIL (RETURN RECEIPT REQUESTED)

NHTSA
Executive Secretariat [FOIA Request]
1200 New Jersey Avenue, SE
West Building, 41-304
Washington, D.C. 20590

Dear Madam or Sir:

According to the closing resume of NHTSA investigation PE16-007 (INCLA-PE16007-7876.PDF), available online at <https://static.nhtsa.gov/odi/inv/2016/INCLA-PE16007-7876.PDF>, "ODI analyzed mileage and airbag deployment data supplied by Tesla for all MY 2014 through 2016 Model S and 2016 Model X vehicles equipped with the Autopilot Technology Package, either installed in the vehicle when sold or through an OTA update, to calculate crash rates by miles travelled prior to and after Autopilot installation.  Figure 11 shows the rates calculated by ODI for airbag deployment crashes in the subject Tesla vehicles before and after Autosteer installation [page 10]."

Based on this statement, it is reasonably believed the Office of Defects Investigation possesses the underlying data that would have been necessary for ODI to have calculated the rates illustrated in Figure 11 on page 11 of that document (see below).



*Figure 11. Crash Rates in MY 2014-16 Tesla Model S and 2016 Model X vehicles Before and After Autosteer Installation.*

RECEIVED

2017 MAR -3  A 8: 27

EXECUTIVE SECRETARIAT

ES17- 000630

Letter to NHTSA Executive Secretariat [FOIA] – Page 2 of 2

Please consider this letter as a Freedom of Information Act (FOIA) request for all of the mileage and airbag deployment data supplied by Tesla analyzed by ODI to calculate the crash rates shown in Figure 11. In addition, we request all records related to any statistical summaries, formulas, models, adjustments, sample weights, and/or any other data or methods relied upon to calculate the crash rates shown in Figure 11.

We assume that it would be least burdensome to NHTSA to produce the requested data in machine-readable, electronic format on CD or DVD disk(s). This is agreeable to us, however, please let us know if our understanding is incorrect.

We ask that you acknowledge your receipt of this FOIA request together with a tracking number that will facilitate follow-up.

We agree to pay fees associated with this request up to a maximum of $250.00, unless you notify us that the fees are likely to exceed this amount.

Should you decide to withhold part or all of the information we are seeking, please provide a "Vaughn Index" that describes the information that is being withheld.

Thank you for the favor of a timely reply.

Very truly yours,

R. A. Whitfield,
Director

# Exhibit 7



U.S. Department
of Transportation

**National Highway
Traffic Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC  20590

March 3, 2017

Mr. R.A. Whitfield
Director, Quality Control Systems Corporation
1034 Plum Creek Drive
Crownsville, MD  21032-1322

Re:  Freedom of Information Act Request No.:  ES17-000630

Dear Mr. Whitfield:

This acknowledges receipt of your March 3, 2017, Freedom of Information Act (FOIA) request
to the National Highway Traffic Safety Administration (NHTSA).  Your request was received by
certified mail on March 3, 2017.

NHTSA may assess fees to process your FOIA request.  We may not process your request until
all fee issues are resolved.  Fees may be assessed even if the search does not produce responsive
records or the agency withholds them from disclosure.

NHTSA employs a multitrack system for processing FOIA requests that:  1) distinguishes
between a simple request and a complex request that may require more time to process; and
2) the number of records involved with respect to the request.  In general, a simple request for a
specific record or a small number of records is typically processed within 20-30 business days.
A complex request that requires a broad search and/or a review of a voluminous amount of
records may take longer.  When NHTSA determines a request is complex, we notify the
requester of estimated processing time.  We process complex requests on a first-in, first-out
basis.

Currently, the agency is experiencing a significant backlog of simple and complex FOIA
requests.  If you submitted a request that appears to seek a significant number of records, we
strongly encourage you to reformulate or narrow your request to limit the scope of your request
in order to qualify for the simple track.  Processing complex requests can take over a year given
current conditions and agency resources.

You may find more information related to the FOIA process and how NHTSA processes your
FOIA here:  http://www.dot.gov/foia.  If you have any questions, or have an interest in
narrowing your request to ensure timely processing of your request, please contact us at
(202) 366-1834.

Sincerely,

NHTSA's FOIA Office

# Exhibit 8



U.S. Department
of Transportation

**National Highway
Traffic Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC  20590

**CERTIFIED MAIL—RETURN RECEIPT REQUESTED**

March 31, 2017

Mr. R. Whitfield
QCS, Quality Control Systems Corp.
1034 Plum Creek Drive
Crownsville, MD 21032-1332

Re:  Freedom of Information Act (FOIA) Request #ES17-000630

Dear Mr. Whitfield:

This is an interim response to your FOIA request dated February 24, 2017.  In accordance with the provisions of 5 U.S.C.§ 552(a)(6)(B) and 49 C.F.R. § 7.33, I am extending by ten working days the time period by which the agency must provide a response on the following basis (see checked box):

☒      The need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request

☐      The need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request

☐      The need for consultation with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject matter interest therein

The agency expects to provide a response by April 14, 2017.

Sincerely,

Monica J. Skinner-Goodman
Senior FOIA Information Specialist

# Exhibit 9



U.S. Department
of Transportation

1200 New Jersey Avenue, SE
Washington, DC 20590

**National Highway
Traffic Safety
Administration**

## CERTIFIED MAIL – RETURN RECEIPT REQUESTED

July 21, 2017

Mr. R. Whitfield
Quality Control Systems Corp.
1034 Plum Creek Drive
Crownsville, MD 21032-1332

Re:  Freedom of Information Act (FOIA) Request #ES17-000630

Dear Mr. Whitfield:

This responds to your February 24, 2017 FOIA request seeking all the mileage and airbag deployment data supplied by Tesla and analyzed by ODI to calculate the crash rates shown in Figure 11.

We have located records responsive to your request.

On August 8, 2016, pursuant to 49 CFR Part 512, Tesla Motors, Inc. (Tesla) submitted a request for confidential treatment for materials related to Tesla Motor's Initial Response to Preliminary Evaluation PE16-007. The submission responds to question 1-4, 8 and 11 provided in response to NHTSA's July 8, 2016 request for information relating to Automatic Emergency Braking (AEB) systems, forward crash mitigation and forward crash avoidance systems in Tesla vehicles. On July 5, 2017, the agency granted Tesla's request for confidential treatment pursuant to FOIA Exemption 4.  I have enclosed a copy of Tesla's August 8, 2016 request and NHTSA's July 5, 2017 confidentiality determination for your review.  Accordingly, for the reasons set forth in NHTSA's July 5, 2017 determination, I am withholding the requested records under Exemption 4 because they contain information related to trade secrets and commercial or financial information. 5 U.S.C. § 552(b)(4).

Pursuant to the provisions of 49 C.F.R. Part 7, there is no charge for this response.

I am the person responsible for this determination.  If you wish to appeal this decision, you may do so by writing to the Chief Counsel, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, S.E., West Building, W41-227, Washington, DC 20590, pursuant to 49 CFR § 7.32(d).  Alternatively, you may submit your appeal via electronic mail to nhtsa.foia.appeal@dot.gov.  An appeal must be submitted within 90 days from the date of this determination.  It should contain any information and argument upon which you rely.  The decision of the Chief Counsel will be administratively final.

You also have the right to seek dispute resolution services from NHTSA's FOIA Public Liaison,

Mary Sprague, who may be contacted on (202) 366-3564 or by electronic mail at Mary.Sprague@dot.gov. Further dispute resolution is available through the Office of Government Information Services (OGIS). You may contact OGIS on (202) 741-5770 or by electronic mail at ogis@nara.gov.

Very Truly Yours,

Andrew J. DiMarsico
Senior Attorney

Enclosure: 11 pages



U.S. Department
of Transportation

**National Highway
Traffic Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

**JUL - 5 2017**

Matthew Schwall
Tesla Motors, Inc.
3500 Dear Creek Road
Palo Alto, CA 94304

Re:     Confidentiality Determination/PE16-007 Initial Information Submissions

Dear Mr. Schwall:

      This responds to your letter of August 8, 2016 requesting confidential treatment for
Tesla Motor, Inc.'s ("Tesla") PE-16007 Initial Information Submission. Specifically, Tesla
requests confidential treatment for the designated information indefinitely. Tesla describes the
submission as containing proprietary information that is privileged and confidential. Tesla
claims that the information has not been publicly disclosed, as the only situations where
portions may have been released were under binding Nondisclosure Agreements. Tesla
contends that disclosure of the information would cause substantial competitive harm.

      Your request is granted.

      To the extent your submission contains potentially personally identifying information
for consumers and owners of vehicles produced by your company, such potentially personally
identifying information—for example, names, addresses, telephone numbers, and the last six
digits of any VINs—are accorded confidential treatment pursuant to Exemption 6 of the
Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b).

      Because Tesla's response was required in response to NHTSA's Preliminary
Evaluation PE16-007 information request under 49 U.S.C. § 30166, I reviewed your claim of
confidential treatment under the test announced in *National Parks & Conservation Association
v. Morton*, 498 F.2d 765 (D.C. Cir. 1974). Under this test, Exemption 4 requires a showing
that the disclosure of commercial or financial information would be likely to cause substantial
competitive harm to the information submitter or that it is likely to impair the Agency's ability
to obtain similar data in the future.

      I have reviewed your submission, including the materials that you claim are entitled to
confidential treatment and the arguments that you assert in support of your claim. I have
determined that the information at issue is likely to cause competitive harm. Tesla has taken
measures to ensure that the material is not public and has not been publicly released.

Therefore, this information is entitled to confidential treatment pursuant to Exemption 4 of FOIA, 5 U.S.C. § 552(b)(4). Subject to the conditions below, this grant of confidential treatment will remain in effect indefinitely.

This grant of confidential treatment is subject to certain conditions. The information may be disclosed under 49 CFR § 512.22 based upon newly discovered or changed facts, and you must inform the Agency of any changed circumstances that may affect the protection of the information (49 CFR § 512.10). If necessary, you will be notified prior to the release of any information under the procedures established by our regulations (49 CFR § 512.22(b)). Furthermore, this information may be disclosed if such disclosure would be in the public interest, pursuant to the procedures established in 49 CFR § 512.23.

Sincerely,

Otto G. Matheke, III
Senior Trial Attorney



August 8, 2016

Jeffrey L. Quandt, Chief
Vehicle Control Division
Office of Defects Investigation
National Highway Traffic Safety Administration
1200 New Jersey Avenue, SE
Washington DC, 20590

              RE:  Tesla Motors Initial Response to PE16-007

Dear Mr. Quandt,

On behalf of Tesla Motors, Inc. ("Tesla" or "the Company"), this submission to the National
Highway Traffic Safety Administration ("NHTSA" or the "Agency") responds to Questions 1
through 4, 8, and 11 a through c of the Agency's July 8, 2016 Preliminary Evaluation PE16-007
letter ("PE 16-007") requesting information about performance of the Automatic Emergency
Braking (AEB) system and any other forward crash mitigation or forward crash avoidance
systems in Tesla motor vehicles.

Answers to the Agency's questions are set forth below. As requested, Tesla has repeated the
applicable request verbatim above each response. Tesla has provided responsive documents,
data, and reports dated, up to and including, July 8, 2016. As we agreed, except where
otherwise noted, the subject vehicles have been defined as all Tesla vehicles originally sold with
Autopilot Convenience Features that have been manufactured for sale or lease in the United
States and federalized territories.

**Question 0:** Provide a list of Vehicle Identification Numbers ("VINs") for all Tesla vehicles that
have been manufactured for sale or lease in the United States and federalized territories that
were not originally sold with Autopilot Convenience Features, but had Autopilot Convenience
Features activated after original sale or lease for some period of time (e.g., by means of a free
trial period or post-sale Autopilot Convenience Features activation).

**Response 0:** The requested information is provided in the folder titled, "Question 0", on the USB
Flash Drive. This folder contains a Microsoft Excel spreadsheet titled, "Question 0.xlsx," which
contains a list of the VINs of vehicles that were not originally sold with Autopilot Convenience
Features but had Autopilot Convenience Features activated after original sale or lease either

     Tesla Motors, Inc – Washington Office

August 8, 2016
Page 2

because the features were purchased after delivery or via a free trial period. Please note that this list was gathered using current data on August 3, 2016. Therefore, it includes some vehicles that purchased or began a trial of Autopilot Convenience Features between July 8, 2016 and August 3, 2016.

**Question 1:** State the number of subject vehicles Tesla has manufactured for sale or lease in the United States and federalized territories. Separately, for each subject vehicle manufactured to date by Tesla, state the following:

    a.  Vehicle identification number (VIN);

    b.  Model;

    c.  Model Year;

    d.  Date of manufacture;

    e.  Date warranty coverage commenced;

    f.  The State in the United States, or the federalized territory, where the vehicle was originally sold or leased (or delivered for sale or lease);

    g.  The date of the last data retrieval;

    h.  The mileage of the vehicle at the last data retrieval;

    i.  The date AEB software was installed on the vehicle;

    j.  The mileage of the vehicle when AEB software was installed;

    k.  The date Autosteer software was installed on the vehicle;

    l.  The mileage Autosteer software was installed on the vehicle;

    m.  The total number of "Hands on Wheel" Autosteer SLOWING warnings recorded;

    n.  The total number of AEB events recorded before Autosteer was installed;

    o.  The total number of AEB events recorded after Autosteer was installed;

    p.  Whether the vehicle experienced any airbag deployments recorded before Autosteer was installed (YES/NO); and

    q.  Whether the vehicle experienced any airbag deployments after Autosteer was installed (YES/NO).

Provide the table in Microsoft Access 2003, 2007, or a compatible format, entitled "PE16 007 PRODUCTION DATA."

**Response 1:** The requested information is provided in the folder titled, "Question 1", on the USB Flash Drive. This folder contains a Microsoft Access database titled "PE16 007 PRODUCTION DATA."





**Question 2:** State the number of each of the following, received by Tesla, or of which Tesla is otherwise aware, which relate to, or may relate to, the alleged defect in in the subject vehicles:

    a. Consumer complaints, including those from fleet operators;

    b. Field reports, including dealer field reports;

    c. Claims against the manufacturer involving a death or injury and other notices received by the manufacturer alleging or proving that a death or injury was caused by a possible defect in a subject vehicle;

    d. Property damage claims;

    e. Third-party arbitration proceedings where Tesla is or was a party to the arbitration; and

    f. Lawsuits, both pending and closed, in which Tesla is or was a defendant or codefendant.

For subparts "a" through "d," state the total number of each item (e.g., consumer complaints, field reports, etc.) separately. Multiple incidents involving the same vehicle are to be counted separately. Multiple reports of the same incident are also to be counted separately (i.e., a consumer complaint and a field report involving the same incident in which a crash occurred are to be counted as a crash report, a field report and a consumer complaint).

In addition, for items "c" through "f," provide a detailed description of the alleged problem and causal and contributing factors and Tesla's assessment of the problem, with a summary of the significant underlying facts and evidence. For items "e" and "f," identify the parties to the action, as well as the caption, court, docket number, and date on which the complaint or other document initiating the action was filed.

**Response 2:** The vehicle populations for both Responses 0 and 1 were searched for Tesla's Responses to 2, 3, and 4. The information sources for each requested category are summarized below. The sources of the data for subparts a through d are primarily the same as those used to submit data to NHTSA when reporting under the Transportation Recall Enhancement, Accountability and Documentation ("TREAD") Act pursuant to the requirements of 49 C.F.R. Part 579. We list below the sources of data searched for each of the enumerated categories.

August 8, 2016
Page 4



August 8, 2016
Page 5



NHTSA has also requested a detailed description of the alleged problem and causal and contributing factors and Tesla's assessment of the problem, with a summary of the significant underlying facts and evidence for each incident enumerated in subparts (c) through (f).



August 8, 2016
Page 6



**Question 3:** Separately, for each item (complaint, report, claim, notice, or matter) within the scope of your response to Request No.2, state the following information:

  a.  Tesla's file number or other identifier used;

  b.  The category of the item, as identified in Request No. 2 (i.e., consumer complaint, field report, etc.);

  c.  Vehicle owner or fleet name (and fleet contact person), address, and telephone number;

  d.  Vehicle's VIN;

  e.  Vehicle's model and model year;

  f.  Vehicle's mileage at time of incident;

  g.  Incident date;

  h.  Report or claim date;

    i.   Type of crash (e.g., rear end collision, intersection collision with crossing vehicle, pedestrian impact, etc.);

    j.   A description of all driver control actions that could have resulted in override of autonomous controls during the event;

    k.  Number of alleged injuries, if any;

    l.   Number of alleged fatalities, if any; and

    m.  Tesla's assessment of the allegation and the performance of the subject system during the event.

Provide this information in Microsoft Access 2003 or 2007, or a compatible format, entitled "PE16_007_REQUESTNUMBER THREE DATA."

**Response 3:** The requested information is provided in the folder titled, "Question 3", on the USB Flash Drive. This folder contains a Microsoft Access database titled "PE16_007_REQUESTNUMBER THREE DATA."

**Question 4:** Produce copies of all documents related to each item within the scope of Request No. 2, including all data logs and recorded images. Organize the documents separately by category (i.e., consumer complaints, field reports, etc.) and describe the method Tesla used for organizing the documents.

**Response 4:** The requested information for category is provided in the folder titled, "Question 4", on the USB Flash Drive, and has been organized into the following main folders: "Consumer Complaints," "Death and Injury Reports," and "Property Damage Claims." Within each folder are folders for each VIN containing documents related to that VIN. Where a single VIN falls into more than one category identical VIN folders exist in more than one main folder. In the case where a single VIN has more than one complaint, a separate folder exists for each complaint.

In identifying information relevant to this question, Tesla pulled from the following sources of information:



**Question 8:** Provide the following information for the most recent 100 AEB events available experienced by the subject vehicles to date:
   a.   The vehicle identification number of the subject vehicle;
   b.   The date and time of the incident;
   c.   Tesla's assessment of the crash type or object avoided.

**Response 8:** The requested information is provided in the folder titled, "Question 8", on the USB Flash Drive. This folder contains a Microsoft Excel spreadsheet titled "Question 8 a-c.xlsx," which contains a list of the most recent 100 AEB events including the VIN of the subject vehicle, the date and time of the incident, and Tesla's assessment of object detected. ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Question 8.1:** Provide logs and images for examples of AEB events experienced by the subject vehicles involving avoidance or mitigation of a crash with vehicles crossing the path of the subject vehicle or avoidance or mitigation of a crash with other objects that are not the front or rear of a vehicle.

**Response 8.1:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Question 11a-c:** Provide a spreadsheet list of all crashes occurring while operating with Autosteer activated or within 15 seconds of a transition/handoff from Autosteer to manual control. Crashes should include all events that include evidence that an impact may have occurred (e.g., airbag deployments, seat belt retractor signals, or other signals/alerts used by Tesla to indicate that a crash has occurred). Include a description of how Tesla identified crashes for this response and provide the following information for each such incident:
   a.   The vehicle identification number of the subject vehicle;
   b.   Whether the vehicle history included evidence of drive cycles with excessive "Hands on Wheel" warnings/alerts (include a definition of the criteria used to determine "excessive"); and
   c.   Date of the crash;

August 8, 2016
Page 9

**Response 11a-c:** The requested information is provided in the folder titled, "Question 11", on the USB Flash Drive. This folder contains a Microsoft Excel spreadsheet titled "Question 11.xlsx,"



• • •

If you have any questions regarding the information provided in this response, you may contact me at (650) 681-5590 or mschwall@tesla.com.

Sincerely,

**Matthew Schwall, Ph.D.**
Director, Field Performance Engineering