**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **QUALITY CONTROL SYSTEMS CORP.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 17-01266 (BAH) |
| ) | |
| **U.S. DEPARTMENT OF TRANSPORTATION,** ) | |
| ) | |
| Defendant. ) | |
| ——————————————————————) | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

Plaintiff Quality Control Systems Corp. initiated this action on June 28, 2017, to

challenge the decision of the National Highway Transportation Safety Administration

("NHTSA"), a component of defendant Department of Transportation, to withhold certain

information requested by plaintiff under the Freedom of Information Act ("FOIA"), 5 U.S.C. §

552.  The agency filed its motion for summary judgment on October 25, 2017 (Dkt. No. 10),

asserting that all of the disputed information has been properly withheld under FOIA Exemption

4, and that some of it is properly withheld under Exemptions 5 and 6.  While plaintiff does not

challenge NHTSA's withholdings under Exemption 6[1], it strongly disputes the agency's

exemption claims under Exemptions 4 and 5.  As such, plaintiff partially opposes defendant's

motion and cross-moves for partial summary judgment and entry of an order requiring the

disclosure of the information discussed herein.

---

[1]  The agency appears to be asserting Exemption 6 claims with respect to information that goes
beyond the specific information plaintiff actually requested.  To the extent that the agency's
claims extend beyond Vehicle Identification Numbers – the only category of information the
agency cites – plaintiff reserves its right to address Exemption 6 in its reply brief.

## Background

### A.       The Tesla Crash and NHTSA's Investigation

As set forth in defendant's motion for summary judgment ("Def. Mem.") at 2, the FOIA request at issue in this case grows out of a fatal crash involving a model year 2015 Tesla Model S.  The crash received nationwide attention – and careful scrutiny within the automotive safety community – because, at the time of the crash, the Tesla Model S was operating in Autopilot mode.   One of the components of Tesla's Autopilot system is called Autosteer, which "uses information from the forward-looking camera, the radar sensor, and the ultrasonic sensors, to detect lane markings and the presence of vehicles and objects to provide automated lane-centering steering control based on the lane markings and the vehicle directly in front of the Tesla, if present."  Defendant's Exhibit 1 at 4-5.

In June 2016, NHTSA's Office of Defect Investigations ("ODI") opened an investigation (Preliminary Evaluation, PE16-007) to examine the performance of the Model S's control and safety systems enabled and in use at the time of the fatal crash.  In connection with the investigation, ODI Division Chief Jeffrey L. Quandt sent Tesla an information request letter on July 8, 2016.  Def. Mem. at 3.[2]  The letter sought information responding to specific questions. "Question 1" sought information concerning all Tesla vehicles equipped with Autopilot, such as the dates and mileages when Autosteer and Automatic Emergency Braking ("AEB") were installed, the number of AEB events recorded before and after Autosteer was installed, and whether the vehicles experienced any airbag deployments before or after Autosteer was installed. *Id.*

---

[2]  While defendant makes reference to this information request letter, it has not entered the letter itself into the record, an omission plaintiff addresses *infra*.

ODI closed its investigation on January 19, 2017, and issued a 12-page closing report, concluding that, according to the agency, "the Autopilot and AEB systems performed as designed and finding insufficient evidence of a defect trend to support the continued examination of the issue." *Id*. at 3-4.  Included in the NHTSA report was a graphic titled "Figure 11," showing the rates for airbag deployment crashes in Tesla vehicles before and after Autosteer installation.   According to the agency, these rates were "calculated by Mr. Quandt," the ODI Division Chief.  *Id*. at 4.

### B.     Plaintiff's FOIA Request

By letter to NHTSA dated February 24, 2017, plaintiff submitted a FOIA request for information concerning the NHTSA report closing investigation PE16-007.  Plaintiff noted the following language from the closing report:

> [The Office of Defects Investigation ("ODI")] analyzed mileage and airbag deployment data supplied by Tesla for all MY 2014 through 2016 Model S and 2016 Model X vehicles equipped with the Autopilot Technology Package, either installed in the vehicle when sold or through an OTA update, to calculate crash rates by miles travelled prior to and after Autopilot installation.  Figure 11 shows the rates calculated by ODI for airbag deployment crashes in the subject Tesla vehicles before and after Autosteer installation.

Plaintiff further stated:

> Based on this statement, it is reasonably believed the Office of Defects Investigation possesses the underlying data that would have been necessary for ODI to have calculated the rates illustrated in Figure 11 on page 11 of that document.

Finally, plaintiff stated that it was requesting under the FOIA "all of the mileage and airbag deployment data supplied by Tesla analyzed by ODI to calculate the crash rates shown in Figure 11," and that, "[i]n addition, we request all records related to any statistical summaries, formulas, models, adjustments, sample weights, and/or any other data or methods relied upon to calculate the crash rates shown in Figure 11."  Defendant's Exhibit 6.

Plaintiff has a long history of publishing articles on its website which present newsworthy information as well as statistical analyses of crash data and other materials obtained through or related to its FOIA requests.  The request at issue here addresses the need to assess the scientific validity of the claim made by NHTSA that airbag deployments in certain vehicles manufactured by Tesla dropped by almost 40 percent after the installation of a component of Autosteer.   Plaintiff filed its FOIA request in order to learn if the methodology NHTSA used is scientifically valid and whether NHTSA's results can be replicated.  Other questions included whether the reduction in crash rates is actually due to Autosteer itself and whether the claimed crash reductions could be expected to continue over a longer period of time.  Declaration of Randall A. Whitfield ("Whitfield Decl.") (filed herewith), ¶¶ 8-9.

By letter to plaintiff dated March 31, 2017, NHTSA stated that it was issuing "an interim response to your FOIA request dated February 24, 2017."  The agency further stated that it was "extending by ten working days the time period by which the agency must provide a response." The agency identified the basis for the extension as "[t]he need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request."  Finally, the letter stated that "[t]he agency expects to provide a response by April 14, 2017."  Defendant's Exhibit 8.

Having received no response from NHTSA, plaintiff initiated this action on June 28, 2017.  Subsequently, on July 21, 2017, the agency belatedly responded to plaintiff's FOIA request, stating that it had located responsive records, but that it was withholding them under Exemption 4.  Defendant's Exhibit 9.  The letter stated, in part: "I have enclosed a copy of Tesla's August 8, 2016 request and NHTSA's July 5, 2017 confidentiality determination for your review."  In fact, the agency did not provide an August 8, 2016 "request" for confidentiality from

Tesla.  Whitfield Decl. ¶18.  Rather, the Tesla correspondence provided to plaintiff was a letter from Tesla responding to ODI's information request, bearing no indication whatsoever that the company was asserting any confidentiality claims.

### Argument

The Freedom of Information Act safeguards American citizens' right to know "what their Government is up to." *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989).  The central purpose of the statute is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  "[D]isclosure, not secrecy, is the dominant objective of [FOIA]." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

Disputes involving the propriety of agency determinations are commonly resolved at the summary judgment stage in FOIA cases. *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 130 (D.D.C. 2011); *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  In FOIA cases, the Court reviews the government's action *de novo*, and the government bears the burden of proof.  5 U.S.C. § 552(a)(4)(B); *Reporters Comm.*, 489 U.S. at 755.  "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action.'" *Id*. (quoting 5 U.S.C. § 552(a)(4)(B)).  "[T]he underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *Fischer v. U.S. Dep't of Justice*, 596 F. Supp. 2d 34, 42 (D.D.C. 2009) (citation and internal quotation marks omitted).

"A party is entitled to summary judgment if the [record] demonstrate[s] that there is no

genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law." *Goodrich v. Teets*, 510 F. Supp. 2d 130 (D.D.C. 2007); *see also* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). In FOIA cases, to be entitled to summary judgment, an agency must prove that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal citation and quotation omitted). FOIA establishes nine exemptions from disclosure, set forth in 5 U.S.C. § 552(b), which "are explicitly made exclusive and must be narrowly construed," *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citations omitted).

Here, the agency is not entitled to summary judgment because it has failed to demonstrate that Tesla submitted the disputed information in the manner required by the agency's confidentiality regulations, or that the information qualifies for confidential treatment under Exemption 4. The agency has also failed to demonstrate that one of the two digital files at issue in this case is entitled to "deliberative process" protection under Exemption 5.

## I.   Tesla Did Not Submit the Requested Information in Conformance With NHTSA's Confidentiality Regulations

The agency's *Vaughn* Index unequivocally states:

Tesla requested that this information be given confidential treatment under Exemption 4 of FOIA. Tesla submitted the request in accordance with agency regulations covering such requests. See 49 CFR Part 512.

Defendant's Exhibit 3. The record, however, indicates that the company did *not* request confidentiality in the prescribed manner at the time the information was submitted.

49 C.F.R. § 512.5(a) requires that "a person must send the [subject information] to the *Chief Counsel* when making a claim for confidential treatment covering submitted material." (emphasis added). In his information request letter to Tesla dated July 8, 2016 – which, as

plaintiff has noted, the agency has not made available to the Court – Mr. Quandt reiterated the

regulatory requirement:

> **Confidential Business Information**
>
> **All business confidential information must be submitted directly to the Office of Chief Counsel as described in the following paragraph and should not be sent to this office**.  In addition, do not submit any business confidential information in the body of the letter submitted to this office.  Please refer to PE16-007 in Tesla's response to this letter and in any confidentiality request submitted to the Office of Chief Counsel.

Exhibit A (filed herewith) at 8 (bold emphasis in original).  The referenced "following paragraph"

stated, in pertinent part:

> If Tesla claims that any of the information or documents provided in response to this information request constitute confidential commercial material . . ., Tesla must submit supporting information together with the materials that are the subject of the confidentiality request, in accordance with 49 CFR Part 512, as amended, to the Office of Chief Counsel . . . .  Tesla is required to **submit two copies of the documents containing allegedly confidential information (except only one copy of blueprints) and one copy of the documents from which information claimed to be confidential has been deleted**.  Please remember that the phrase "ENTIRE PAGE CONFIDENTIAL BUSINESS INFORMATION" or "CONTAINS CONFIDENTIAL BUSINESS INFORMATION" (as appropriate) must appear at the top of each page containing information claimed to be confidential, and the information must be clearly identified in accordance with 49 CFR 512.6.

*Id*. at 8-9 (bold emphasis in original).

The disputed information was *not* submitted by Tesla to the Chief Counsel and, contrary

to Mr. Quandt's explicit instruction that, if confidentiality was being requested, the information

"**should not be sent to this office**," the information *was* sent directly to Mr. Quandt.  *See*

Defendant's Exhibit 2 ("Tesla Motors Initial Response to PE16-007").  The letter is notable for

two other reasons.  First, despite Mr. Quandt's specific instruction (in the letter not provided to

the Court) that "the top of each page containing information claimed to be confidential" must

bear an appropriate confidentiality marking, no such markings appear in the Tesla Initial

Response, despite the redaction of large blocks of information.[3]

The other notable aspect of the Tesla Initial Response sent directly to Mr. Quandt concerns the filename of the requested information.  The agency's regulations provide:

> Files and materials that cannot be marked internally, such as video clips or executable files or files provided in a format specifically requested by the agency, shall be renamed prior to submission so the words ''Confidential Bus Info'' appears in the file name or, if that is not practicable, the characters ''Conf Bus Info'' or ''Conf'' appear.

49 C.F.R. §512.6(c)(2).  Mr. Quandt states in his declaration that "[a]mong other information submitted . . . [was] a flash drive containing the requested Microsoft Access database, which was titled 'CBI_PE16 007_PRODUCTION DATA.'"  Declaration of Jeffrey Quandt ("Quandt Decl."), ¶10 (citations omitted).  Curiously, however, the Initial Response letter from Tesla, by which the company provided the requested information, states that the USB flash drive provided to NHTSA "contains a Microsoft Access database titled PE16 007 PRODUCTION DATA" – with no "CBI" prefix.  Defendant's Exhibit 2 at 2.

To summarize, Tesla provided the allegedly confidential information directly to Mr. Quandt, after he informed the company that any such information should *not* be sent to his office, but rather to the agency's chief counsel.  The Tesla letter did not bear any notations or markings indicating that it contained confidential information, despite the fact that NHTSA provided the letter to plaintiff in heavily redacted form.  Contrary to Mr. Quandt's assertion that the filename of the database he received from Tesla contained the prefix "CBI," the contemporaneous letter from Tesla refers to a filename without such a prefix.  These facts strongly suggest that the

---

[3]  49 C.F.R. § 512.6, cited by Mr. Quandt in his information request, provides that "[t]he word 'CONFIDENTIAL' must appear on the top of each page containing information claimed to be confidential."

information was provided to NHTSA without a request for confidentiality in conformance with the agency's regulations.[4]

## II.   The Disputed Information Is Not Properly Exempt From Disclosure Under FOIA Exemption 4

NHTSA seeks to withhold all of the information responsive to plaintiff's request under FOIA Exemption 4, which permits the withholding of "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). *See United Techs. Corp. v. Dep't of Defense*, 601 F.3d 557, 563 (D.C. Cir. 2010). The agency asserts that the information was 1) "commercial" Def. Mem. at 11; 2) "obtained from a person," *id.*; and 3) "confidential," *id.* at 12. Plaintiff agrees that the withheld information was "obtained from a person" and is "commercial" within the meaning of Exemption 4, but strongly disputes the agency's contention that the information qualifies as "confidential."

In its caselaw, the D.C. Circuit has, for the purpose of determining whether information is "confidential" under Exemption 4, distinguished between information that was voluntarily provided to an agency and information that was submitted on a mandatory basis. When information is provided to the government voluntarily, it "is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person

---

[4] The only indication of a Tesla request for confidentiality defendant has placed in the record is a letter from the company to NHTSA's chief counsel, bearing the date of August 8, 2016. Plaintiff simply notes that, in a FOIA request submitted to NHTSA on March 13, 2017, another requester sought "all of Tesla's confidentiality requests associated with Preliminary Evaluation (PE) 16-007 and the agency's responses to these requests." In response, the agency released Tesla requests dated June 17, 2016; December 30, 2016; and January 6, 2017. The agency did not account for a Tesla request dated August 8, 2016. Exhibit B (filed herewith). In its July 21, 2017, letter to plaintiff, the agency stated that it was "enclos[ing] a copy of Tesla's August 8, 2016 request and NHTSA's July 5, 2017 confidentiality determination for your review." In fact, the agency did not provide an August 8, 2016 "request" for confidentiality from Tesla. Whitfield Decl. ¶18. Rather, the Tesla correspondence provided to plaintiff was the letter from Tesla responding to ODI's information request, bearing no indication whatsoever that the company was asserting any confidentiality claims. Defendant's Exhibit 9.

from whom it was obtained." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (*en banc*).  If, on the other hand, submission of the information was mandatory, it qualifies as "confidential" if disclosing it would either 1) "impair the Government's ability to obtain necessary information in the future"; or 2) "cause substantial harm to the competitive position of the person from whom the information was obtained."  *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974).  Here, the withheld information plaintiff seeks to have disclosed was, according to the agency, provided under the mandate of the agency's investigatory requirements, and the so-called *National Parks* test thus applies.  Def. Mem. at 11 ("Tesla's submission had been involuntary").

As this Court has noted, "[d]etermining whether a document is 'confidential' [under Exemption 4] . . . typically turns on a *fact-specific inquiry* regarding whether the release of such information would 'cause substantial harm to the competitive position of the person from whom the information was obtained.'"  *Scudder v. CIA*, 25 F. Supp. 3d 19, 31 (D.D.C. 2014), quoting *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290-91 (D.C. Cir. 1983) (emphasis added).  Indeed, as the D.C. Circuit held in *Public Citizen*, "[c]onclusory and generalized allegations of substantial competitive harms, of course, are unacceptable and cannot support an agency's decision to withhold requested documents."  704 F.2d at 1291; *see also Biles v. Dep't of Health & Human Servs.*, 931 F. Supp. 2d 211, 230 (D.D.C. 2013) (agency "has the burden of showing that *substantial* competitive *harm* is *likely*") (emphasis in original).  Claims of "competitive harm" under Exemption 4 must also be "logical or plausible."  *Falkenstein v. Dep't of Housing & Urban Development*, 952 F. Supp. 2d 288, 294 (D.D.C. 2013) (citation omitted).  Plaintiff submits that a "fact-specific inquiry" of the circumstances

surrounding the withheld information demonstrates that the disputed material can in no way be legitimately characterized as "confidential" under Exemption 4.

Initially, it is important to understand the limited nature of the information plaintiff seeks. Plaintiff's request sought: "all of the mileage and airbag deployment data supplied by Tesla analyzed by ODI to calculate the crash rates shown in Figure 11 [of NHTSA's Report attached to Closing Resume of Preliminary Evaluation PE16-007]." According to Mr. Quandt, he calculated the crash rates depicted in Figure 11 by "examining the sums of the miles driven prior to Autosteer activation, miles driven after Autosteer activation, airbag deployment events prior to Autosteer activation and airbag deployment events after Autosteer activation for all of the subject vehicles." Quandt Decl., ¶17. Thus, the data requested in plaintiff's FOIA request relied upon by Mr. Quandt were only *four* of Tesla's answers to Question 1 of the original information request (Defendant's Exhibit 2 at 2): 1) Item h - The mileage of the vehicle at the last data retrieval; 2) Item l - The mileage when Autosteer software was installed on the vehicle; 3) Item p - Whether the vehicle experienced any airbag deployments recorded before Autosteer was installed (YES/NO); and 4) Item q - Whether the vehicle experienced any airbag deployments recorded after Autosteer was installed (YES/NO). Whitfield Decl., ¶25. In sum, the categories of data supplied by Tesla that are at issue are two vehicle odometer readings and two indications of possible airbag deployments, derived from fewer than 50,000 vehicles. Whitfield Decl., ¶16.

"In reviewing the sufficiency of [agency] declarations and *Vaughn* indices, the Court is mindful that merely conclusory statements about competitive harm, even if repeated numerous times, are not sufficient." *Public Citizen v. Dep't of Health and Human Servs*., 975 F. Supp. 2d 81, 114 (D.D.C. 2013) (citations omitted). Indeed, the agency itself recognizes that "[t]o meet its burden of demonstrating that the records are exempt from disclosure, a defendant agency may

rely on a declaration or *Vaughn* index, so long as it is relatively detailed and non-conclusory."

Def. Mem. at 9 (citation omitted).  Here, the agency's showing is not only conclusory; it is also

sparse.  The totality of the agency's Exemption 4 rationale is as follows:

> This document contains business and technical information regarding Tesla's
> vehicles, its software, and vehicle log data.  Tesla requested that this information
> be given confidential treatment under Exemption 4 of FOIA.  Tesla submitted the
> request in accordance with agency regulations covering such requests. See 49
> CFR Part 512.  Tesla described that the information could be used by competitors
> to gain insight on how to improve their own business processes and gain
> knowledge about Tesla's operations and evaluation of events that would have
> otherwise required significant expenditure.  Based on its review of the materials,
> NHTSA concluded that the information was entitled to confidential treatment
> pursuant to Exemption 4 of FOIA.

Defendant's Exhibit 3.

The agency avers that "Tesla described that the information could be used by

competitors," and, with respect to the log data at issue here, the company asserted as follows:

> Log Data: The log data contained in Tesla's PE 16-007 Initial Information
> Submission is not publicly available, but rather is compiled at great expense by
> Tesla for internal, proprietary purposes.  It would be of great interest to
> competitors to understand the minutiae of data that Tesla collects regarding all of
> its vehicles, as well as how it analyzes that data in response to not only customer
> complaints but extraordinary cases.  As such, it is imperative that such data
> remains confidential.

Defendant's Exhibit 4, at 3.  *See also* Def. Mem. at 10 (reiterating the above language from Tesla

concerning "log data").

These brief assertions are "merely conclusory statements about competitive harm," of the

sort routinely rejected by the courts.  In addition, they ignore the fact that a great deal is publicly

known about the "minutiae of data that Tesla collects."  It is fundamental that "if the information

is publicly available, it is not protected by Exemption 4."  *CNA Fin. Corp. v. Donovan*, 830 F.2d

1132, 1154 (D.C. Cir. 1987); *see also Ctr. for Auto Safety v. Nat'l Highway Traffic Safety*

*Admin.*, 93 F. Supp. 2d 1, 10-11 (D.D.C. 2000) ("No competitive harm can result if the

information is publicly available through other sources."); *Nw. Coal. for Alts. to Pesticides v. Browner*, 941 F. Supp. 197, 202 (D.D.C. 1996) ("If the information at issue is publicly available through other sources, no showing of competitive harm can be made.").

First, the "minutiae of data that Tesla collects" is known to the public through the website the agency references in its brief: <https://www.tesla.com/about/legal> (a printout of that page is filed herewith as Exhibit C).  Def. Mem. at 11.  As Tesla there states:

> We may collect a variety of information from or about your Tesla vehicle, including:
>
> Telematics log data:  To improve our vehicles and services for you, we may collect certain telematics data regarding the performance, usage, operation, and condition of your Tesla vehicle, including the following: e.g., vehicle identification number; speed information; *odometer readings*; battery use management information; battery charging history; electrical system functions; software version information; infotainment system data; safety-related data and camera images (including, e.g., information regarding the vehicle's SRS systems, braking and acceleration, security, e-brake, and accidents); short video clips of accidents; information regarding the use and operation of Autopilot, Summon, and other features; and other data to assist in identifying issues and analyzing the performance of the vehicle.  We may collect such information either in person (such as during a service appointment) or via remote access.   . . .
>
> Other vehicle data: In order to help improve our products and services, we may collect and store other vehicle data, such as: data about accidents involving your Tesla vehicle (e.g., *air bag deployment and other recent sensor data*); data about remote services (e.g., remote lock/unlock, start/stop charge, and honk-the-horn commands); a data report to confirm that your vehicle is online together with information about the current software version and certain telematics data; vehicle connectivity information; data about any issues that could materially impair operation of your vehicle; data about any safety-critical issues; and data about each software and firmware update.  We may collect such information either in person (e.g., during a service appointment) or via remote access.

Customer Privacy Policy (Exhibit C) at 2 (emphasis added).  Tesla has thus already disclosed to the public, as well as its competitors, that it collects categories of data including "odometer readings" and "air bag deployment and other recent sensor data" – the very information at issue in this case.

13

Additionally, publicly available government reports on the Model S crash – including

NHTSA's closing report on the investigation at issue here – divulge details of the data Tesla

collects.  NHTSA's report states:

> Data obtained from the Model S indicated that: 1) the Tesla was being operated in
> Autopilot mode at the time of the collision; 2) the Automatic Emergency Braking
> (AEB) system did not provide any warning or automated braking for the collision
> event; 3) the driver took no braking, steering or other actions to avoid the
> collision; and 4) the last recorded driver action was increasing the cruise control
> set speed to 74 mph less than two minutes prior to impact.

Defendant's Exhibit 1 at 1.

A report issued by the National Transportation Safety Board contains even more detail:

> The Tesla Model S stores data in nonvolatile memory using a removable secure
> digital (SD) card installed within the vehicle's electronic control unit (ECU).
> Parameter data are written continually to the ECU while the car is on.  Typical
> parameters of vehicle system performance include steering angle, accelerator
> pedal position, driver-applied brake pedal application, vehicle speed, automated
> system states, and lead vehicle distance, among others.  Some of these parameters
> are recorded continuously at a set sample rate; others are recorded only when the
> state of a system changes.  All parameter data are timestamped using a global
> positioning system (GPS)-derived clock time as they arrive at the ECU.

National Transportation Safety Board, "Collision Between a Car Operating With Automated

Vehicle Control Systems and a Tractor-Semitrailer Truck Near Williston, Florida, May 7, 2016"

(available at https://www.ntsb.gov/investigations/AccidentReports/Reports/HAR1702.pdf), at

14.  The report contains great detail on the kinds of data available to investigators:

> Figure 11 illustrates the periods of time during the crash trip when the driver
> interacted with the steering wheel.  Vehicle performance data showed that for the
> 41-minute trip from Cedar Key, Autopilot was active for 37 minutes.  During the
> trip, while Autopilot was in use, the system detected driver-applied torque on the
> steering wheel on seven different occasions for a total of 25 seconds.  The longest
> period between alerts during which Autopilot did not detect the driver's hands on
> the steering wheel was nearly 6 minutes.  For the entire trip, Autopilot was in
> some form of warning mode for a total of approximately 2 minutes.

> Vehicle-recorded data for the trip that originated in Cedar Key showed that the
> system displayed the initial visual warning to the driver seven times (displaying

the text message "Hold Steering Wheel" on the instrument panel).  The system
progressed to the initial auditory warning (alert chime 1) six times during the trip.
Progression to the second auditory warning (alert chime 2) did not occur during
the trip, nor did the system initiate the Autosteer deactivation protocol.

**System Performance Data**. The vehicle performance data revealed the
following:

• The crash-involved Tesla's last trip began at 3:55:23 p.m.  The car was stopped
or nearly stopped about 4:19 p.m. and again about 4:30 p.m.  The collision with
the truck occurred at 4:36:12.7, as indicated by fault codes and system
disruptions.

• The last driver input before the crash was to increase the TACC [Traffic-Aware
Cruise Control] speed to 74 mph at 4:34:21, which was 1 minute 51 seconds
before the crash.  After that input, there was no driver interaction with Autopilot,
no change in steering angle, and no brake lamp switch activation until the
collision.

• During the last trip, TACC detected a vehicle ahead of the Tesla seven times.
For the final 1 minute 35 seconds preceding the crash, TACC detected no lead
vehicle in front of the Tesla.

• About 9.7 seconds before the collision, the motor torque demand steadily
decreased (indicating that the vehicle was on a descending grade).  The reported
torque demand dropped to zero at the time of the first fault report.

• No brakes were applied before or during the collision.

• Vehicle headlights were not on at the time of the collision.

• The driver was wearing his seat belt during the trip.

• Throughout the approach to the collision with the truck, the electronic power
assist steering exhibited no substantial changes in steering angle.

• There was no record indicating that the Tesla's automation system identified the
truck that was crossing in the car's path or that it recognized the impending crash.
Because the system did not detect the combination vehicle - either as a moving
hazard or as a stationary object - Autopilot did not reduce the vehicle's speed, the
FCW did not provide an alert, and the AEB did not activate.  All recorded data
were consistent with the FCW and AEB systems being enabled when the crash
occurred.

*Id*. at 14-16 (footnotes omitted).

In light of the vast amount of publicly available information describing the kinds of data

Tesla collects with respect to the operations of its vehicles, there is clearly no support for the

agency's assertion that disclosure of *four* data elements concerning odometer readings and airbag

deployments would likely cause Tesla to "suffer substantial competitive harm." *See Biles*, 931

F. Supp. 2d at 230 (agency "has the burden of showing that *substantial* competitive *harm is*

*likely*") (emphasis in original).[5]

### III.   The Requested Information Is Not Properly Exempt From Disclosure Under FOIA Exemption 5

The agency asserts that the Excel file titled "PE16_007_PRODUCTION

DATA_jlq_working_file_10Jan2017" is exempt from disclosure under Exemption 5.  The

agency explains its rationale:

> The Excel file contains Mr. Quandt's work product, including his decisions about
> how to look at Tesla's data, how to select portions of it to examine, and how to
> interpret it.  While the Excel file contains factual data that might not otherwise be
> considered deliberative, the use of the data by Mr. Quandt in evaluating the
> Autopilot system and writing the closing report renders the Excel file part of
> NHTSA's deliberative process.

Def. Mem. at 13-14 (citation omitted).  In support of that claim, the agency cites *Reliant Energy*

*Power Generation, Inc. v. F.E.R.C.*, 520 F. Supp. 2d 194, 206 (D.D.C. 2007), where the

magistrate judge upheld a deliberative process claim for spreadsheets and tables the agency

described as "data analysis."  In support of his conclusion, the magistrate relied upon the

agency's description of the material:

> The investigators have to make decisions about how to look at the data, how to
> select portions of the data to examine, and how to interpret the data.  These
> included matters such as what types of transactions to examine (such as long-term

---

[5]  The cited examples of publicly available information concerning Tesla's collection of vehicle data do not even take into account the fact that the collected data is actually owned by the vehicle owners, and *not* Tesla.  The Driver Privacy Act of 2015 provides that "[a]ny data retained by an event data recorder . . . is the property of the owner . . . of the motor vehicle in which the event data recorder is installed."  § 24302(a), 49 U.S.C. § 30101 note (2015).  Regulations promulgated by NHTSA define "event data recorder" as "a device or function in a vehicle that records the vehicle's dynamic time-series data during the time period just prior to a crash event (*e.g.*, vehicle speed vs. time) or during a crash event (*e.g.*, delta-V vs. time), intended for retrieval after the crash event."  49 C.F.R. § 563.5.  As such, any Tesla owner would have a right of access to the kinds of data at issue here.

or short-term), what time periods, which companies' transactions, which sizes of
transactions, how to follow a series of transactions (which might show a company
buying in one market and quickly selling in another market).  The parameters
used in these spreadsheets and tables were exercises of judgment on the part of
the investigators.

*Id*. (citation omitted).

Here, in contrast, Mr. Quandt has flatly asserted that "[i]n performing the calculation for

Figure 11, I did not rely upon any statistical summaries, formulas, models, adjustments, sample

weights, or any other data or methods."  Quandt Decl., ¶20.  Indeed, he describes an entirely

straightforward process that did not involve the kind of "parameters" at issue in *Reliant Energy*.

The closing report included Figure 11, a graph reflecting crash rates in model year
2014-16 Tesla Model S and 2016 Model X vehicles before and after Autosteer
was installed.

As part of the investigation and deliberation leading up to the decision to close
PE16-007, I performed an analysis of Tesla's raw vehicle data to determine
whether and to what extent crash rates changed after the installation of Autosteer.

In performing the calculation, I relied solely upon the information contained in
the Access database titled "CBI_PE16_007_PRODUCTION DATA."  I
performed that calculation by examining the sums of the miles driven prior to
Autosteer activation, miles driven after Autosteer activation, airbag deployment
events prior to Autosteer activation and airbag deployment events after Autosteer
activation for all of the subject vehicles.

I created a separate Microsoft Excel file to store the information from the Access
database and perform the calculation: I titled that file
"PE16_007_PRODUCTION DATAJlqworking_file_1 OJan20 17."

Quandt Decl., ¶¶15-18 (citations omitted).  The results of that straightforward "calculation"

process were published as Figure 11 in NHTSA's public report.  As such, there is no privileged,

deliberative process at issue.  There is no indication that Mr. Quandt "culled selected facts and

data from the mass of available information," as would be required to invoke the privilege.

*McKinley v. Bd. of Governors of the Fed. Res. Sys*., 849 F. Supp. 2d 47, 64 (D.D.C. 2012).

## Conclusion

Defendant has failed to carry its burden of "showing that *substantial* competitive *harm* is *likely*" if the three categories of disputed information are disclosed.  *Biles*, 931 F. Supp. 2d at 230 (emphasis in original).  Instead, the agency has put forward "[c]onclusory and generalized allegations of substantial competitive harms," which "are unacceptable and cannot support [its] decision to withhold" the information.  *Public Citizen*, 704 F.2d at 1291.  Similarly, NHTSA's Exemption 5 claim is not supported in the record.  As such, the agency's actions cannot survive *de novo* review and the Court should find that the disputed information has been improperly withheld.


Respectfully submitted,


*/s/  David L. Sobel*
DAVID L. SOBEL, D.C. Bar No. 360418
5335 Wisconsin Avenue, N.W.
Suite 640
Washington, DC 20015
(202) 246-6180

*Counsel for Plaintiff*