**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **QUALITY CONTROL SYSTEMS CORP.,**<br><br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF TRANSPORTATION,**<br><br>Defendant. | Civil Action No. 17-cv-01266 (BAll) |

**DECLARATION OF RANDALL A. WHITFIELD**

I, RANDALL A. WHITFIELD, hereby declare:

1. I am the president of plaintiff Quality Control Systems Corporation. I have held that position since 1987. I have been professionally involved in research and statistical computing for more than forty years.

2. Quality Control Systems Corp. specializes in computer-intensive research with large databases of accident and insurance claim records. We have collaborated in numerous projects described in peer-reviewed, scientific journals since our founding. I have given invited presentations to the Transportation Research Board of the National Research Council of the National Academy of Sciences as well as the National Transportation Safety Board. Our company often provides statistical and programming services for public health research regarding motor vehicle crashes and injuries.

3. I am the principal author or second author of scientific articles in the field of injury epidemiology that have appeared in the *The New England Journal of Medicine*, the *American Journal of Public Health*, *The Journal of Trauma*, *Accident Analysis and Prevention*, and *Injury Prevention*. All of these journals are peer-reviewed and all are indexed in the MEDLINE database of citations and abstracts of biomedical research. According to Google Scholar, these papers have received hundreds of citations in the scientific literature.

4. I have served as a peer reviewer for the *American Journal of Public Health* and for *Injury Prevention*. I am a member of the American Statistical Association. I have

been qualified as an expert witness to give testimony in the areas of statistics, epidemiology, research data management and analysis.

5. Articles about our company's research have appeared in *Scientific American*, *Health News*, and *Health* magazine. Together with Mrs. Alice Whitfield, our opinions and scientific research have been cited by major media outlets such as *The New York Times*, *The Washington Post, The Los Angeles Times*, *The Boston Globe*, *USA Today,* "The NBC Nightly News," and "Good Morning America."

6. In addition to news about our research published in print, on television, and on Internet news sites, Quality Control Systems Corp. has maintained its own website at <http://quality-control.us/> since 2005.

7. Quality Control Systems Corp. has a long history of publishing articles on our website which present newsworthy information as well as statistical analyses of crash data and other materials obtained through or related to our Freedom of Information Act (FOIA) requests. These web pages include: 1) "An Unusual Cluster of Fatal Crashes on I-8 in San Diego County, California," <http://quality-control.us/san_diego.html>; 2) "An Unusual Cluster of Fatal Rollover Crashes on I-5 in Fresno County, California," <http://quality-control.us/fresno_rollovers.html>; 3) "Keeping Secrets about NASA's 'Toyota Study' of Unintended Acceleration," <http://quality-control.us/keeping_secrets.html>; 4) "Covering Up Redactions in NASA's 'Toyota Study' of Unintended Acceleration," <http://quality-control.us/cover_up.html>; and 5) "Missing Facts in the NHTSA/General Motors Ignition Switch Scandal," <http://quality-control.us/nhtsa_gm_switch.html>. These articles are based on our original reporting and editing of data and materials disclosed by the National Highway Traffic Safety Administration (NHTSA) pursuant to our Freedom of Information Act requests. Based on the Internet traffic they generate, these articles are plainly of interest to a segment of the public interested in automobile and consumer product safety, having been downloaded more than 3,000 times in 2016 alone. None of these published web pages was written for the specific purpose of making a profit nor were any of these undertakings financially supported by any outside party.

8. The materials which are the subject of our present Freedom of Information Act request are not sought for commercial use. Instead, our FOIA request addresses the need to assess the scientific validity of the remarkable claim made by NHTSA that airbag deployments in certain vehicles manufactured by Tesla, Incorporated (hereafter, Tesla) dropped by almost 40 percent after the installation of a component of Tesla's Autopilot

system, Autosteer.[1] The data we are seeking specifically involve airbag deployments in Tesla vehicles before and after the installation of the Autopilot component of Tesla's Autopilot driver assistance program. (*See* paragraphs 15-16, 25, and 34-35 following.) The data were analyzed by NHTSA as part of the Agency's investigation (Preliminary Evaluation PE16-007) into the Automatic Emergency Braking or Autopilot systems of Model Year 2014-2016 Tesla Model S and Model X vehicles.

9. We filed our FOIA request in order to learn if the methodology NHTSA used is scientifically valid and whether NHTSA's results can be replicated. Other questions included whether the reduction in crash rates is actually due to Autosteer itself and whether the claimed crash reductions could be expected to continue over a longer period of time.

10. The remarkable improvement in crash safety that NHTSA associates with Autosteer would be very welcomed if NHTSA's dramatic safety claims prove to be scientifically sound. But it is concerning that the claimed crash reductions are associated by NHTSA with the mere "installation" of Autosteer, rather than the actual activation of Autosteer while driving. NHTSA's analysis is just as astonishing for the fact that it lacks the most basic information necessary for reaching well-founded conclusions about the claimed crash rate reductions. In particular, the published description of the Agency's findings[2] in the report of the Agency's investigation into the Automatic Emergency Braking or Autopilot systems of Model Year 2014-2016 Tesla Model S and Model X vehicles do not meet long-established, scientific standards that would allow for an assessment of statistical confidence intervals or of statistical significance. Even the numerators and the denominators of the calculated crash rates are missing, so it was necessary to include a specific request for records related to any statistical summaries by NHTSA of the underlying data.

11. The surprising claim by NHTSA of an extraordinary reduction in crash rates associated with the installation of Autosteer must be carefully considered in the context of the Agency's failure to allow public access to the underlying data. Such an important conclusion by the Agency should not be based on data that the Government is withholding from researchers who want to examine NHTSA's results. This is because such secrecy makes replication of these results impossible by independent scientists outside the government. Such policies are fundamentally opposed to the scientific method which depends on the replication of research results to validate scientific findings.

---

[1] NHTSA, Report attached to Closing Resume of Preliminary Evaluation PE16-007, <https://static.nhtsa.gov/odi/inv/2016/INCLA-PE16007-7876.PDF>, p. 10, accessed November 18, 2017.

[2] NHTSA, *ibid*.

12. For the purpose of writing this Declaration, I have reviewed the following documents filed with the Court by the Government in response to our complaint: the "Memorandum of Points and Authorities in Support of U.S. Department of Transportation's Motion for Summary Judgment" (hereafter the "Memorandum of Points"); the "Declaration of Jeffrey Quandt" (hereafter "the Quandt Declaration"); the "Declaration of Otto G. Matheke, III" (hereafter the "Matheke Declaration"); "Exhibits 1-9 Referenced in: Exhibit A (Declaration of Jeffrey Quant) and Exhibit B (Declaration of Otto G. Matheke, III)" (hereafter the "Defendant's Exhibits").

13. The categories of data supplied by Tesla that are the specific subjects of our actual FOIA request are two vehicle odometer readings and two indications of possible air-bag deployments. (*See* paragraphs 15-16, and 25 following.)

14. Based on my review of the record submitted by the Government, the grounds cited by Tesla for confidential treatment under Exemption 4 do not appear to me to apply to the actual odometer data or the data about airbag deployments we have requested under FOIA. (*See* paragraphs 15-16, and 25 following.)

15. According to the Vaughn Index (Defendant's Exhibits, Exhibit 3), the government is withholding data that are responsive to our FOIA request in two computer files: 1) an "Access Database from Tesla (CBI_PE16-007_PRODUCTION DATA). Produced on a flash drive by Tesla on August 8, 2016 in response to Question 1 in NHTSA's July 8, 2016 Information Request Letter"; and 2) an "Excel File (PE16_007_PRODUCTION DATA_jlq_working_file_10Jan2017 ). ODI analysis of Tesla CBI production data." The responsive data in item 2 were abstracted or derived from item 1. (*See* Quandt Declaration at paragraph 18.)

16. I note that the data we have specifically requested includes only a small portion of the two files stated in the Vaughn Index: two odometer readings and two indications of possible airbag deployment in fewer than 50,000 vehicles as well as potential summaries of these data. (*See* paragraphs 25 and 34 below.) Based on my review of the existing record, it is not possible to determine with certainty whether or not the summaries of these data (the numerators and denominators that underlie the reported crash rates) we have requested are also part of the second file stated in the Vaughn Index, "Excel File (PE16_007_PRODUCTION DATA_jlq_working_file_10Jan2017 ). ODI analysis of Tesla CBI production data."

17. In his Declaration, Mr. Jeffrey Quandt of NHTSA states: "Tesla provided its initial response to the information request letter on August 8, 2016. *See id.* Among other information submitted, the initial response included a brief narrative response to Question 1

addressed to me, along with a flash drive containing the requested Microsoft Access database, which was titled 'CBI_PE16 007_PRODUCTION DATA.' See Exhibit 2 at p. 2; *see also* Exhibit 3, Vaughn Index. ... I saved the Microsoft Access database to my personal network drive in a subfolder that I created for the investigation titled 'PE 16007.'" (Quandt Declaration, paragraphs 10 and 11.)

18. On July 21, 2017, Mr. Andrew J. DiMarsico, a Senior Attorney at NHTSA, responded to our FOIA request of February 24, 2017. (Defendant's Exhibits, Exhibit 9, pages 1-2.) In this response, Mr. DiMarsico noted that, "On August 8, 2016, pursuant to 49 CFR Part 512, Tesla Motors, Inc. (Tesla) submitted a request for confidential treatment for materials related to Tesla Motor's Initial Response to Preliminary Evaluation PE16-007. The submission responds to question 1-4, 8 and 11 provided in response to NHTSA's July 8, 2016 request for information relating to Automatic Emergency Braking (AEB) systems, forward crash mitigation and forward crash avoidance systems in Tesla vehicles. On July 5, 2017, the agency granted Tesla's request for confidential treatment pursuant to FOIA Exemption 4. I have enclosed a copy of Tesla's August 8, 2016 request and NHTSA's July 5, 2017 confidentiality determination for your review." In fact, NHTSA's response dated July 21, 2017 to our FOIA request did not enclose any such "copy of Tesla's August 8, 2016 request" for confidential treatment.

19. I am aware that on May 8, 2017, Ms. Monica J. Skinner-Goodman, a Senior FOIA Information Specialist at NHTSA, responded to a FOIA request from Ms. Ellen Liberman of The Safety Record Newsletter & Blog dated March 13, 2017 (*See* Whitfield Exhibit B.) According to Ms Skinner-Goodman, Ms. Liberman requested, among other items, "All of Tesla's confidentiality requests and the Agency's responses to these requests." Ms. Skinner-Goodman responded that "I have enclosed Tesla's June 17, 2016, December 30, 2016, and January 6, 2017, requests for confidential treatment, and NHTSA's March 27, 2017 confidentiality determination." Ms. Skinner-Goodman's response did not indicate that NHTSA was withholding any documents responsive to this part of Ms. Liberman's request. I note that – just as NHTSA did not produce any "copy of Tesla's August 8, 2016 request" for confidential treatment in its response to our FOIA request – neither did NHTSA produce any copy of Tesla's August 8, 2016 request for confidential treatment in its response to Ms. Liberman's FOIA request. NHTSA also did not disclose to her that they were withholding that document.

20. In the August 8, 2017 request for confidentiality from Tesla to NHTSA, which has only now been disclosed as part of the Government's Motion for Summary Judgment, Tesla states: "<u>Competitive Harm.</u> The information provided in the PE 16-007 Initial Information Submission is entitled to confidential treatment under 5 U.S.C. § 552(b)(4), as modi-

fied pursuant to 49 U.S.C. § 32910, and NHTSA regulations at 49 C.F.R. § 512 because release of this information would cause substantial competitive harm to Tesla. The information includes specific business and technical information regarding Tesla's vehicles, its software, and the Company's methods of evaluating vehicle issues. If released, such information would cause substantial competitive harm to Tesla by revealing to competitors information about Tesla's proprietary operations and technology not otherwise available outside of the Company. Such information is commercially valuable to competitors because it provides them with additional insight on how to improve their own business processes in identifying problems and tracking their vehicles' field performance. Competitors could use this information to gain knowledge about Tesla's operations and evaluation of events that would have otherwise required significant expenditure, resulting in cost savings." (Defendant's Exhibits, Exhibit 4, pages 1-2.)

21. Regarding the "Log Data" that are apparently the source of some of the data that are the subject of our FOIA request, Tesla states: "The log data contained in Tesla's PE 16-007 Initial Information Submission is not publicly available, but rather is compiled at great expense by Tesla for internal, proprietary purposes. It would be of great interest to competitors to understand the minutiae of data that Tesla collects regarding all of its vehicles, as well as how it analyzes that data in response to not only customer complaints but extraordinary cases. As such, it is imperative that such data remains confidential." (Defendant's Exhibits, Exhibit 4, page 3.)

22. In fact, Tesla retrieves and maintains vehicle log data not only for the competitive edge such data may confer on Tesla when kept confidential, but also to engage in selective public disclosure of vehicle log data about specific vehicles (including odometer data) when it suits their purposes to do so. (*See*, for example, comments made in 2013 by Tesla's Product Architect and CEO, Mr. Elon Musk, regarding an unfavorable review of a Tesla Model S that appeared in the *New York Times* at: <https://www.tesla.com/blog/most-peculiar-test-drive>, last accessed on November 18, 2017. *See* also, "Musk: Autopilot Was Off In PA Tesla Model X Crash, According To Onboard Vehicle Logs," at: <https://jalopnik.com/musk-autopilot-was-off-in-pa-tesla-model-x-crash-acco-1783695454>, accessed November 21, 2017.

23. It is very remarkable that NHTSA would deny our FOIA request based on its determination that Tesla would be likely to "suffer substantial competitive harm" if NHTSA were to disclose the data we have requested (Memorandum of Points, page 12.) In fact, Tesla itself appears to have seen an opportunity to gain a competitive advantage by repeating and publicizing NHTSA's conclusion claiming dramatic crash reductions associated with

Autosteer. Tesla Incorporated's CEO and Product Architect, Mr. Elon Musk, lost no time following the release of NHTSA's Report claiming a nearly 40 percent "crash rate" reduction after the installation of Autosteer to repeat NHTSA's claim on his Twitter account (See <https://twitter.com/elonmusk /status/822129092036206592>, accessed November 21, 2017.) "The Tesla Team" also released "Tesla's Statement on NHTSA's Report" on its website as soon as NHTSA's report was released, stating: "At Tesla, the safety of our customers comes first, and we appreciate the thoroughness of NHTSA's report and its conclusion." (See <https://www.tesla.com/blog/teslas-statement-nhtsa-report>, accessed November 21, 2017.) Tesla's public appreciation of NHTSA's work is fundamentally at odds with NHTSA's position that the data supporting their conclusion would be competitively harmful to Tesla. I note also that NHTSA's claim of important crash reductions associated with Autosteer is based entirely on the underlying data we are seeking.

24. Confidential treatment for the records sought in our FOIA request was granted to Tesla by Mr. Otto Matheke, III, a Senior Attorney at NHTSA . In his letter to Tesla dated July 5, 2017, Mr. Matheke stated: "I have reviewed your submission, including the materials that you claim are entitled to confidential treatment and the arguments that you assert in support of your claim. I have determined that the information at issue is likely to cause competitive harm. Tesla has taken measures to ensure that the material is not public and has not been publicly released. Therefore, this information is entitled to confidential treatment pursuant to Exemption 4 of FOIA, 5 U.S.C. § 552(b)(4)." (Defendant's Exhibits, Exhibit 9, pages 3-4.)

25. In fact, Tesla's claim that competitive harm would result "by revealing to competitors information about Tesla's proprietary operations and technology not otherwise available outside of the Company" is irrelevant to the specific information submitted by Tesla that we requested from NHTSA: that is, "all of the mileage and airbag deployment data supplied by Tesla analyzed by ODI to calculate the crash rates shown in Figure 11 [of NHTSA's Report attached to Closing Resume of Preliminary Evaluation PE16-007[3]]." According to Mr. Quandt, he calculated the crash rates depicted in Figure 11 by "examining the sums of the miles driven prior to Autosteer activation, miles driven after Autosteer activation, airbag deployment events prior to Autosteer activation and airbag deployment events after Autosteer activation for all of the subject vehicles." (*See* Quandt Declaration, paragraph 17.) Based on this statement, the data requested in our FOIA relied upon by Mr. Quandt were only four of Tesla's answers to Question 1 of the original information request (Defendant's Exhibit 2, page 1): 1) Item h - The mileage of the vehicle at the last data retrieval; 2) Item l - The mileage when Autosteer software was installed on the vehicle; 3) Item p - Whether the vehicle experienced any airbag deployments recorded before Autosteer was installed (YES/NO);

---

[3] NHTSA, *ibid*.

and 4) Item q - Whether the vehicle experienced any airbag deployments recorded after Autosteer was installed (YES/NO). It is my understanding that these four data items do not constitute "information about Tesla's proprietary operations and technology not otherwise available outside of the Company." (*See* paragraphs 26-30 below.)

26. The mere fact that data was "compiled at great expense by Tesla for internal, proprietary purposes" (Defendant's Exhibit 4, page3) does not automatically make confidential business information out of the categories of data that are the subjects of our FOIA request, that is, two odometer readings and two indications of possible airbag deployments. Whatever the internal proprietary purposes that Tesla might have in compiling the data, the fact is that specific odometer and airbag deployment data about specific vehicles are obviously available outside of Tesla to the owners of the vehicles bought from Tesla as well as public officials such as police and vehicle inspectors.

27. An odometer reading in a particular Tesla vehicle reveals nothing about Tesla's proprietary operations and technology that is likely to cause competitive harm to Tesla. An odometer reading is only a statement of mileage travelled that is recorded about a motor vehicle at a particular point in time. It is my understanding that a motor vehicle's odometer reading does not constitute business information insofar as the odometer does not refer to Tesla's own operation as a business. It is my understanding that an odometer reading does not constitute technical information because the odometer does not require any specialized knowledge to be understood.

28. NHTSA itself makes available on the Internet a database of consumer complaints at <https://www-odi.nhtsa.dot.gov/downloads/index.cfm> involving travel miles. Based on data I reviewed on November 15, 2017, there are more than 400 reports of mileage or mileage estimates involving consumer complaints about Tesla vehicles in this publicly available database published by NHTSA.

29. It is my understanding that the mere fact of whether or not an airbag deployment has occurred in a particular Tesla vehicle does not constitute knowledge about Tesla's proprietary operations or its technology.

30. NHTSA itself makes available on the Internet a database of consumer complaints available at <https://www-odi.nhtsa.dot.gov/downloads/ index.cfm> involving airbag deployments. Based on data I reviewed on November 15, 2017, there are more than 75 reports specifying whether or not airbags deployed in the consumer complaints about Tesla vehicles in this publicly available database published by NHTSA.

31. In its Motion for Summary Judgment, the Government relies on Tesla's claim that it "would be of great interest to competitors to understand the minutiae of data that Tesla

collects regarding all of its vehicles, as well as how it analyzes that data." (Memorandum of Points, page 10.) Yet the information provided to NHTSA by Tesla that we actually requested through FOIA does not involve any analysis of data by Tesla nor does it involve the disclosure of any method by which Tesla analyzes its data. All of the analyzing of the data we have requested has been done by NHTSA, not Tesla. Any disclosure of the methods and results applicable to these data was similarly done by NHTSA, not by Tesla.

32. The "minutiae of data that Tesla collects" is known to the public through the website that NHTSA references in its Memorandum of Points at <https://www.tesla.com/about/legal>. (Memorandum of Points, page 11.) Tesla has already disclosed to the public on that website as well as to its competitors that it is collecting categories of data including "odometer readings"[4] and "air bag deployment and other recent sensor data."[5] These facts cannot be sensitive or confidential because Tesla has already publicly divulged this information on the Internet.

33. According to the Government: "In the race to roll out fully-functional autonomous vehicles, big data is invaluable. Tesla has a competitive advantage in this space given its position as the sole manufacturer performing real world beta-testing of autonomous technologies on a fleet of tens of thousands of vehicles. No other manufacturer comes close to testing its technologies on that scale." (Memorandum of Points, p. 12.) In fact, the data supplied by Tesla that NHTSA analyzed and that we are actually requesting through FOIA is decidedly small scale: a very small portion of two files, including only two odometer readings and two indications of airbag deployments. Mr. Quandt was able to analyze the data we are requesting in an Excel spreadsheet. (*See* Quandt Declaration, paragraph 18.) According to the Closing Resume for PE16-007 the entire population of Model Year 2014-2016 Tesla

---

[4] "To improve our vehicles and services for you, we may collect certain telematics data regarding the performance, usage, operation, and condition of your Tesla vehicle, including the following: e.g., vehicle identification number; speed information; odometer readings; battery use management information; battery charging history; electrical system functions; software version information; infotainment system data; safety-related data and camera images (including, e.g., information regarding the vehicle's SRS systems, braking and acceleration, security, e-brake, and accidents); short video clips of accidents; information regarding the use and operation of Autopilot, Summon, and other features; and other data to assist in identifying issues and analyzing the performance of the vehicle. We may collect such information either in person (such as during a service appointment) or via remote access." Tesla, Inc., Customer Privacy Policy, <https://www.tesla.com/about/legal>, accessed November 29, 2017.

[5] "In order to help improve our products and services, we may collect and store other vehicle data, such as: data about accidents involving your Tesla vehicle (e.g., air bag deployment and other recent sensor data); data about remote services (e.g., remote lock/unlock, start/stop charge, and honk-the-horn commands); a data report to confirm that your vehicle is online together with information about the current software version and certain telematics data; vehicle connectivity information; data about any issues that could materially impair operation of your vehicle; data about any safety-critical issues; and data about each software and firmware update. We may collect such information either in person (e.g., during a service appointment) or via remote access." Tesla, Inc., Customer Privacy Policy, <https://www.tesla.com/about/legal>, accessed November 29, 2017.

Model S and Model X fleets is only 43,781 vehicles. (*See* Defendant's Exhibits, Exhibit 1, page 1.) A collection of data at so small a scale cannot be considered "big data".

34. Among other records, our FOIA request sought "... all records related to any statistical summaries, formulas, models, adjustments, sample weights, and/or any other data or methods relied upon to calculate the crash rates shown in Figure 11 [of NHTSA's Report]." (See Defendant's Exhibit 6, page 2.) Because neither the source data nor the statistical methods used to calculate the crash rates shown in Figure 11 were specified in the Report (Defendant's Exhibit 1), the language of our FOIA request was chosen to ensure that the numerators (the sums of airbag deployment events prior to Autosteer activation and airbag deployment events after Autosteer activation for all of the subject vehicles) and the denominators (the sums of the miles driven prior to Autosteer activation, miles driven after Autosteer activation) of the calculated crash rates would be disclosed in response to our request if such numerators or denominators were actually calculated and still existed at the time of our request. Mr. Quandt's makes it clear that he did perform these calculations by employing the following method: "I performed that calculation by examining the sums of the miles driven prior to Autosteer activation, miles driven after Autosteer activation, airbag deployment events prior to Autosteer activation and airbag deployment events after Autosteer activation for all of the subject vehicles." (Quandt Declaration, paragraph 17.)

35. Three paragraphs later in his Declaration, Mr. Quandt denies that he relied upon any summaries or formulas: "In performing the calculation for Figure 11, I did not rely upon any statistical summaries, formulas, models, adjustments, sample weights, or any other data or methods." (Quandt Declaration, paragraph 20.) The Government's also states that Mr. Quandt: "... knew what information he did not rely upon (e.g., statistical summaries, formulas, models, adjustments, sample weights)." (Memorandum of Points, page 9.) Notwithstanding these denials, based on the information in the paragraph above, the sums of the miles driven prior to Autosteer activation, the miles driven after Autosteer activation, counts of airbag deployment events prior to Autosteer activation and airbag deployment events after Autosteer activation for all of the subject vehicles were calculated and should be disclosed in response to our FOIA request if such records still exist.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed: November 29, 2017

By: [signature]

Randall A. Whitfield
President
Quality Control Systems Corporation